JOHN BAIRD, Appellant, *v.* THE MAYOR, ALDERMEN AND COM-
MONALTY OF THE CITY OF NEW YORK, Respondent.

In reviewing the determination of a trial court on questions of fact, when
the evidence is conflicting, an appellate court is not warranted in revers-
ing, upon the sole ground that, in its opinion, the trial court should have
reached a different conclusion ; to justify a reversal it must appear that
the proofs so clearly preponderated in favor of a contrary conclusion
that it can be said with a reasonable degree of certainty that the trial
court erred in its conclusions.

A purchaser of personal property, delivered in performance of an execu-
tory contract, which is alleged to have been procured by fraud, waives
that objection by acceptance of the property, after knowledge of the
fraud, and is precluded by such acceptance from repudiating the contract
in an action brought to recover the purchase-price.

So, also, it is the duty of a party who has been induced to enter into such
a contract through fraud, if he desires to avail himself of that objection,
to act upon the first opportunity after discovery of the fraud, and
rescind the contract by repudiating its obligations, and restoring what-
ever has been received under it. If he delays acting, and retains prop-
erty delivered under the contract beyond a reasonable time after such
discovery, he is held to have ratified the contract.

These rules apply to municipalities as well as to individuals.

To authorize the setting aside of a contract made by a municipal officer
on its behalf, on the ground of fraud, the fraud must be clearly proved.
While it may be established by circumstantial evidence, it can only be
so established by proof of such circumstances as are irreconcilable with
any other theory than that of the guilt of the persons accused of the
fraud.

It is not competent for a municipal corporation to relieve itself from its
contract obligations by assailing the general character and reputation of
its lawful agents, or to refuse to perform a contract made by an agent
on the ground of his unfaithfulness in other transactions.

The provisions of the acts of 1870 and 1871 (§ 13, chap. 383, Laws of
1870 ; § 5, chap. 213, Laws of 1871), authorizing the commissioner of
public works in his discretion to purchase water-meters for the city
of New York, and to raise, in the manner specified, moneys to pay there-
for, gave to that officer authority to enter into an executory contract for
the purchase of said meters. The commissioner was also invested with
a discretion to determine the number of meters required.

*It seems* that even a mistake of the commissioner, in this particular, would
not affect the rights of an innocent party contracting with him.

The provision of the act of 1861 (Chap. 308, Laws of 1861), requiring all

contracts on behalf of the city corporation to be awarded to the lowest bidder, has no application to such a contract.

The said commissioner also had authority to bind the city by acceptance of meters delivered under such a contract.

In an action to recover the contract-price for certain water-meters furnished by N., plaintiff's assignor, to defendant under a contract with the commissioner of public works, where one of the defenses was fraud, C., a witness for defendant, was allowed to testify to offers of money made to him by G., an agent of N., employed to sell his meters to the city of W., to secure the friendly offices of the witness in favor of the introduction of said meters there. *Held,* that the offers were not within the scope of any proved agency on the part of G., and were inadmissible against plaintiff.

The answer set up as a defense, not as a counter-claim, alleged defects and imperfections in the meters furnished. No damages were claimed or found on the trial. *Held,* that the question as to whether a counter-claim might not have been established was not available on appeal; and that an erroneous order of the General Term reversing a judgment in favor of plaintiff and granting a new trial might not be affirmed for the purpose of enabling defendant to present such a counter-claim.

(Argued June 10, 1884; decided October 7, 1884.)

APPEAL from order of the General Term of the Supreme Court in the first judicial department, made October 26, 1883, which reversed, on questions of fact as well as of law, a judgment in favor of plaintiff, entered upon the report of a referee, and granted a new trial.

This action was brought to recover the contract-price for ten thousand water meters alleged to have been sold and delivered to defendant by Jose F. Navarro, plaintiff's assignor. The material facts are stated in the opinion.

*Samuel Hand, Ashbel Green* and *A. J. Vanderpoel* for appellant.    The declarations of agents as to past transactions are never admissible and were properly disregarded by the referee.  (*Utter* v. *R. R. Co.,* 6 Daly, 227; *National B'k* v. *Ocean B'k,* 60 N. Y. 278; *Hoppy* v. *Mosher,* 48 id. 313; *Anderson* v. *R., W. & O. R. R. Co.,* 54 id. 334; *Wallis* v. *Randall,* 81 id. 164.)  It was not necessary before letting the contract to advertise for bids.  (*People* v. *Van Nort,* 64 Barb. 205; *Green* v. *Mayor, etc.,* 60 N. Y. 303, 312; *Peo-*

*ple* v. *Flagg*, 17 id. 584; *Harlem G. L. Co.* v. *Mayor, etc.*, 33 id. 309, 310, 320.) This court adhered to this doctrine in *Nelson* v. *Mayor, etc.* (63 N. Y. 535); *Cleveland Co.* v. *Met. Comm'rs* (55 Barb. 288); *Trundy* v. *Nort* (65 id. 331); *Matter of Dugro* (50 N. Y. 513); *Kingsley* v. *City of Brooklyn* (78 id. 213). If a referee's decision is not against the weight of evidence, or might well have been either way, or the evidence is slight that leads to a contrary conclusion, the appellate court should not disturb it. (*Westerlo* v. *De Witt*, 36 N. Y. 340; *Parrott* v. *Knickerbocker Ice Co.*, 46 id. 361; *Crane* v. *Bandouine*, 55 id. 256; *E. R. B'k* v. *Gore*, 57 id. 598; *Godfrey* v. *Moser*, 66 id. 250; *Schultz* v. *Hoagland*, 85 id. 468; *Sherwood* v. *Harris*, 94 id. 626; *Kingsley* v. *City of Brooklyn*, 78 id. 215; Code, § 1338; *Roosa* v. *Smith*, 17 Hun, 138; *Stuckey* v. *Mather*, 24 id. 461; *Baker* v. *Cutting*, 2 Sweeny, 435; *Smith* v. *Hathorn*, 25 Hun, 159; *Adee* v. *Demorest*, 54 Barb. 433; *Schultz* v. *Hoagland*, 85 N. Y. 468.) The defense that the contract is illegal, because not founded upon bids or proposals, and not approved by the corporation counsel, is untenable. (*People* v. *Van Nort*, 64 Barb. 205; *People* v. *Green*, 2 T. & C. 62; *Green* v. *Mayor, etc.*, 60 N. Y. 303.) The charter of 1870 operated as a repeal by implication of the act of 1861, upon the principle that where the latter statute, not purporting to amend the former one, covers the whole subject, and it is apparent it was intended to be a substitute for all laws on the subject, it repeals necessarily the former one, even though not entirely inconsistent with it. (*Heckman* v. *Pinkney*, 81 N. Y. 211; *People* v. *Brooklyn*, 69 id. 605; *Burroughs* v. *Brinkerhoff*, 68 id. 259; *In re Robbins*, 82 id. 131, 137.) The provisions of the statute under which this contract was made were special, and expressly gave discretion incompatible with letting to the lowest bidder. (*Green* v. *Mayor*, 60 N. Y. 318; *People* v. *Van Nort*, 64 Barb. 208; *People* v. *Flagg*, 17 N. Y. 584; *Harlem Gas Co.* v. *Mayor*, 33 id. 309, 330; *Farmers' L. & T. Co.* v. *Mayor*, 4 Bosw. 80; 33 N. Y. 324, 329, 330; *Detwiller* v. *Mayor*, 1 T. & C. 657; *In re Dugro*, 50 N. Y. 513;

*People, ex rel. Trundy*, v. *Van Nort*, 65 Barb. 331.)   The defense that the water meters were not suitable for the purpose specified by the act authorizing their purchase is untenable. (*People* v. *Van Nort*, 64 Barb. 205 ; *Kingsley* v. *City of Brooklyn*, 78 N. Y. 215 ; *Rex* v. *Mayor of London*, 3 B. & A. 371 ; *Platt* v. *Monroe*, 34 Barb. 293.)   The defense that there was not, at the time of making the contract or since, any appropriation to pay for the meters is not available.   (*Nelson* v. *Mayor*, 63 N. Y. 535 ; *People* v. *Green*, 64 id. 499; 2 T. & C. 64; *Baldwin* v. *City of Oswego*, 1 Abb. Ct. of App. Dec. 62.)   While it is true that under express statutes forbidding a contract, where there is no appropriation, a contract made in the absence of appropriation is void.   (*Donovan* v. *Mayor*, 33 N. Y. 291, 293.)   Yet a new legislative authority to contract, without any such express restriction, takes the particular work out of the general rule, and implies the power to contract irrespective of the general restrictions, and dispenses with the necessity for a previous appropriation.   (*Greene* v. *Mayor*, 60 N. Y. 303 ; *Nelson* v. *Mayor*, 63 id. 535, 538 ; *People, ex rel. Schaick*, v. *Green*, 64 id. 499 ; *People, ex rel. Navarro*, v. *Green*, 2 N. Y. Sup. Ct. 62 ; *People, ex rel. Navarro*, v. *Van Nort*, 64 Barb. 205 ; .*People, ex rel. Murphy*, v. *Kelley*, 5 Abb. N. C. 383 ; *Lawrence* v. *Mayor*, 54 How. Pr. 255, 259 ; 2 Laws of 1871, chap. 583, p. 1268.)   The Two Per Cent Act (Chap. 582, Laws of 1871) was void, being in conflict with the constitutional provision that no private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title.   (Const., art. 3, § 16 ; *Huber* v. *People*, 49 N. Y. 132, 135 ; *People* v. *O'Brien*, 38 id. 193; *People, ex rel. Adsit*, v. *Allen*, 42 id. 378; *Gaskin* v. *Meek*, 42 id. 186 ; *In re Meyer*, 50 id. 504 ; *People, ex rel. City of Rochester*, v. *Briggs*, id. 553 ; *People, ex rel. Davis*, v. *Commissioners of Taxes*, 47 id. 501 ; *Pullman* v. *Mayor*, etc., 54 Barb. 169 ; *People, ex rel. McConville*, v. *Hill*, 35 N. Y. 449 ; *People, ex rel. Lee*, v. *Supervisors of Chautauqua*, 43 id. 10 ; *Sun Mutual* v. *Mayor*, 8 id. 421 ; *Halstead* v. *Mayor*, 3 id. 437 ; *People, ex rel. Morris*, v.

*Edmonds,* 15 Barb. 529.) The contract was not void as against public policy. (*Lyons* v. *Mitchell,* 36 N. Y. 235, 242.) Want of knowledge on part of city officials as to the invalidity of the contract is immaterial on question of acceptance. (*Dutchess Co.* v. *Harding,* 49 N. Y. 321.) The defendant never having offered to return the meters, or any one of them, cannot now object that the accepted meters were not made as the contract required. (*Gurney* v. *At. Ry. Co.,* 58 N. Y. 358; *Day* v. *Pool,* 52 id. 416; *Muller* v. *Eno,* 14 id. 601; *Voorhees* v. *Earl,* 2 Hill, 288; *Cary* v. *Gruman,* 4 id. 625; *Ezeman* v. *Casella,* L. R., 2 C. P. 431, 677; *Messmore* v. *N. Y. Shot Co.,* 40 N. Y. 422; *McCormick* v. *Sarson,* 45 id. 265; *Reed* v. *Randall,* 29 id. 358; *Foot* v. *Bently,* 44 id. 166; *Rust* v. *Eckler,* 41 id. 488; *Dutchess Co.* v. *Harding,* 49 id. 321; *Gaylord* v. *Allen,* 53 id. 515; *Dounce* v. *Dow,* 64 id. 411.) This case, notwithstanding the large amount involved and that a city is one of the parties to the contract, is to be tried like any other case. The amount makes no difference, and a city is to be treated like any other party. (*Arredondo Case,* 6 Peters, 691–716; *People* v. *Stephens,* 71 N. Y. 529.) The contract was not under seal, so far as the corporation was concerned. The seal of the agent is not the seal of the corporation. (*Dubois* v. *D. & H. C. Co.,* 4 Wend. 285; *Farron* v. *Sherwood,* 17 N. Y. 227.) A defense that plaintiff's patent is invalid could only be made in a case of a sale of a patent itself. (*Marston* v. *Swett,* 66 N. Y. 206; 82 id. 526, 533; *Jones* v. *Burnham,* 67 Me. 93; *Lawes* v. *Purser,* 38 Eng. L. & Eq. 48; 6 El. & Bl. 930; *Hall* v. *Conder,* 38 Eng. L. & Eq. 253; 2 C. B. [N. S.] 22; 3 Jurist [N. S.], 963.) To make the admissions or declarations of one person, not a party to the action, evidence against another, they must be shown to be in a conspiracy together. (*Cuyler* v. *McCartney,* 40 N. Y. 221; *Ormsby* v. *People,* 53 id. 472; *People* v. *Davis,* 56 id. 102; *Place* v. *Minster,* 65 id. 89; *Miller* v. *Barber,* 66 id. 558; *N. Y. G. & I. Co.* v. *Gleason,* 78 id. 505.) An agent's declarations are only admissible if made while he is agent and touching the subject-matter of his agency. (*Thallheimer* v. *Brink-*

*erhoff,* 4 Wend. 394 ; *Webb* v. *Alexander,* 7 id. 281 ; *Warner*
v. *Warren,* 46 N. Y. 228 ; *Baptist Ch.* v. *Brooklyn Ins. Co.,*
28 id. 153 ; *Luby* v. *H. R. R. R. Co.,* 17 id. 131 ; Story
on Agency, § 135 ; *Robinson* v. *Morgan,* Littel's Sel. Cas. 56 ;
*White* v. *Miller,* 71 N. Y. 118 ; *First N. B'k* v. *Ocean B'k,*
60 id. 278 ; *Hamilton* v. *N. Y. C. R. R. Co.,* 51 id. 100 ;
*Anderson* v. *R., W. & O. R. R. Co.,* 54 id. 334 ; *Johnston* v.
*Thompson,* 23 Hun, 90 ; *Marshuetz* v. *McGreevy,* id. 408 ;
*People* v. *Davis,* 56 id. 95, 103 ; *Milbank* v. *Dennistoun,* 10
Bosw. 382 ; *Color Ptg. Co.* v. *Brown,* 37 Supr. Ct. 433 ;
*Wallis* v. *Randall,* 81 N. Y. 164 ; *Rawls* v. *Ins. Co.,* 27
id. 282 ; *Noyes* v. *Phillips,* 16 Abb. [N. S.] 400 ; *Dutchess
Co.* v. *Harding,* 49 N. Y. 321.)

*Francis N. Bangs* for respondent. Chapter 308 of the
Laws of 1861, page 738, and also section 104 of the charter
of April 5, 1870 (Laws of 1870, p. 39), was in force on August
21, 1871, not having been then repealed expressly or by im-
plication. (*People* v. *Van Nort,* 64 Barb. 209.) Section 5
of the Two Per Cent Act of 1871 (chapter 583, Laws of 1871)
deprived the commissioner of public works of the power to
make the contract in question, without a previous appropria-
tion, and no such previous appropriation having been made,
the contract imposed no liability upon the city beyond what it
in fact collected. (64 Barb. 209 ; *Nelson* v. *Mayor,* 63 N. Y.
543 ; *Smith* v. *Newburgh,* 77 id. 137.) The acts described in
the answer, and constituting what is spoken of as an acceptance,
were not the acts of any agent of the defendant authorized to
commit the defendant to an obligation to pay. (*People* v.
*Green,* 2 T. & C. 62.) If the contract was authorized by law,
and the defendant has received nothing to enable it to com-
ply with its terms, the plaintiff cannot recover. (*Smith* v.
*Newburgh,* 77 N. Y. 137.) Such acceptance as was stated in
the answer and shown by the proofs did not preclude the de-
fendant from claiming that the meters were not made in con-
formity with the contract, and were incapable of doing the
work imposed upon them. (*Hawkins* v. *Pemberton,* 51 N. Y.

198; *Van Wyck* v. *Allen*, 69 id. 67; *White* v. *Miller*, 71 id. 118; *Brown* v. *Colie*, 1 E. D. Smith, 265; *Adams* v. *Mayor*, 4 Duer, 295; *Smith* v. *Brown*, 17 Barb. 431; *Hatch* v. *Peet*, 23 id. 575; *Hosley* v. *Black*, 28 N. Y. 438; *Brown* v. *Weber*, 38 id. 187; *Lamb* v. *R. R. Co.*, 46 id. 278; *Muller* v. *Eno*, 14 id. 597; *Rust* v. *Eckler*, 41 id. 488; *Dutchess Co.* v. *Harding*, 49 id. 321; *Day* v. *Pool*, 52 id. 420; *Parks* v. *Ax & Tool Co.*, 54 id. 536; *Dounce* v. *Dows*, 57 id. 76; *Gurney* v. *R. R. Co.*, 58 id. 362.) The proved breaches of warranty and the proved uselessness of the meters should have reduced the plaintiff's recovery, if they did not defeat it wholly, either to the cost of the meters to himself or to their value to the defendant. (*Gurney* v. *R. R. Co.*, 58 N. Y. 362; *Stone* v. *Frost*, 61 id. 614; *Nichols* v. *Townsend*, 7 Hun, 376; *Gautier* v. *Douglass Co.*, 13 id. 525; *Butler* v. *Kellogg*, 4 Daly, 108; *Marshuetz* v. *McGreevy*, 23 Hun, 408.) The evidence proved that while the meters delivered to the defendant were a fraud upon the contract, the contract itself was a fraud upon the city. (*U. S.* v. *Arredondo*, 6 Peters, 691; *In re Bininger*, 7 Blatchf. 277.)

RUGER, Ch. J. This appeal is exceptional, since it requires the court to consider and review questions both of fact and law.

The trial of the case before the referee resulted in a report in favor of the plaintiff, upon which judgment was entered accordingly. On appeal from this judgment the General Term, upon a consideration of the evidence, reversed the judgment and ordered a new trial, upon the ground of alleged errors committed by the referee in arriving at his conclusions of fact, and so certified in its order of reversal. From this order the plaintiff appealed to this court, upon executing the required stipulation for judgment absolute in case of affirmance.

This appeal requires us to examine the evidence to discover whether sufficient reason existed to justify the General Term in reversing the findings of the referee. (§§ 1337, 1338, Code of Civ. Pro.)

The case was tried under pleadings substantially alleging, upon the part of the plaintiff, the sale by one Jose F. Navarro

to the defendant, of ten thousand water meters at the price of $70 each, under a contract for the purchase made August 22, 1871, between Navarro and the defendant, through its superintendent of public works; the delivery of the property according to the terms of the contract in the years 1871 and 1872; its acceptance by the defendant, and the assignment of the claim against the defendant to the plaintiff by Navarro. The answer substantially *admitted the facts stated in the complaint,* but contained a number of affirmative allegations by way of defense, among which the following only are material in this connection, viz. :

*First.* That the contract was procured by the plaintiff's assignor through fraud and collusion between Wm. M. Tweed, the commissioner of public works, one Alexander Frear and others, as agents of the city, and himself, and that thereby the defendant was exempted from liability on such contract.

*Second.* That Navarro failed in the performance of his contract by reason of the inferior material, unskillful workmanship and defective construction of the meters delivered. These facts were not, however, pleaded by way of counter-claim, nor were damages claimed by the defendant on account of such defects.

Upon the commencement of the trial it was insisted by the defendant, and held by the court, that the admission in the answer established a *prima facie* cause of action in the plaintiff, and that the only issues to be tried were those involving the sufficiency and existence of the facts set up by way of defense.

It will thus be seen that the defendant voluntarily assumed the burden of proof, and admitting its apparent liability, undertook, by a preponderance of evidence, to establish the facts constituting a defense. It was thus required not only to prove the alleged fraud, but also to explain why the acceptance of the property purchased did not preclude it from raising the defense set up in the answer.

The trial took place before a referee, whose long experience, abundant learning, and high character afforded the strongest guaranty of a fair and impartial decision, reached after an intelligent and conscientious consideration of the evidence and

law applicable thereto. The trial extended over a period of six years, during which time a vast amount of testimony was taken, and the questions presented were earnestly and thoroughly litigated by the parties.

Upon the material questions controverted before us, the referee reported as follows :

" That as admitted by the pleadings and confirmed by the evidence, the said Navarro delivered to the defendants, *and the defendants accepted,* prior to the 17th day of September, 1871, four thousand and fifty of said water meters, including indicators, and the said Navarro delivered to the defendants, *and the defendants accepted* thereafter, and prior to the 1st day of July, 1872, the remainder of said meters, including indicators, to-wit, five thousand nine hundred and fifty."

" That there was a substantial performance of the contract on the part of said Navarro, and that the water meters, with indicators so delivered, were substantially such as the contract called for in respect of material, workmanship, strength and capacity, and were of approved pattern and suitable for the purposes for which they were purchased." " The said Jose F. Navarro made and entered into said contract in good faith. The contract was not procured by corrupt, dishonest or collusive dealing with any officer or agent of the defendant, nor by corrupt, unlawful or improper influences employed or exercised upon or with the commissioner of public works, or upon or with any officer or agent of the defendants." " The defendants failed to establish any corrupt, fraudulent or wrongful agreement or understanding between said Navarro and the commissioner of public works or any officer or agent of the defendants in respect to the making or the performance of said contract." " The defendants failed to establish any bargain, agreement or understanding between said Navarro and Alexander Frear mentioned in the answer, that said Frear should use efforts or influence with the then commissioner of public works to procure the making of the contract." " The defendants failed to establish that the contract, in whole or in part, was procured by the exercise of any influence by said Frear with

or upon said commissioner of public works." " The defendants failed to establish that Alexander Frear was in any way interested in the contract between Jose F. Navarro and the defendants or in the profits and proceeds thereof."

After a complete and thorough reading of the voluminous evidence presented by the record, and a consideration thereof in the light of established rules governing appellate tribunals in reviewing findings of fact made by a trial court, we are of the opinion that the evidence was altogether insufficient to authorize the General Term to reverse the judgment.

The questions involved have been met by the able counsel for the defendant in a spirit of candor, and presented with a force and ingenuity that has commanded our respect even though they have failed to convince our judgment.

Although the amount involved in the litigation is large, the principles of law relating thereto are of familiar application, and free from reasonable doubt, and a comprehensive view of the facts seems to us to remove the questions arising thereon equally far from probable misconception.

We are of the opinion that the admitted facts in the case disclose two indisputable grounds upon which the plaintiff was entitled to recover in the action.

A purchaser of personal property, delivered in performance of an executory contract which is alleged to have been procured by fraud, waives the objection which he might otherwise have to such contract by the acceptance of the property sold, after knowledge of the fraud, and is precluded by such acceptance from repudiating the contract in an action brought to recover the price of the article sold.

We also think that the evidence is insufficient to establish the existence of any fraud in the inception or execution of the contract, which entitles the defendant to be relieved from its obligations.

In reviewing the determination of a trial court upon questions of fact, an appellate tribunal is not warranted in reversing, upon the sole ground that, in its opinion, the trial court should have reached a different conclusion upon conflicting evidence.

The beneficial exercise of the power of review in such cases it is true, can be attained only by relieving the appellate tribunal, from the obligation of adopting arbitrarily the conclusions of the trial court, but a proper regard for the advantages possessed by that court in the disposition of questions affecting the credibility of witnesses, and those depending upon the weight and authority of conflicting evidence, require great consideration to be accorded to its opinions. To justify a reversal it must appear that such findings were against the weight of evidence, or that the proofs so clearly preponderated in favor of a contrary result that it can be said with a reasonable degree of certainty that the trial court erred in its conclusions. It is undoubtedly the duty of an appellate tribunal, where it is invested with the power of reviewing questions of fact, already passed upon by a court of original jurisdiction, to examine the evidence and to determine the facts for itself, and the rule forbidding a reversal where there is conflicting evidence, or some evidence to sustain the finding, does not apply to such a case. (*Godfrey* v. *Moser*, 66 N. Y. 250.) But when there is evidence on both sides and the case is balanced and the mind of the court has been called upon to weigh conflicting statements and inferences, and decide upon the credibility of opposing witnesses, much weight must be accorded to the especial adaptation of the trial court to investigate and determine such questions. Any other rule would nullify the peculiar advantages which that tribunal possesses, in observing the manner and appearance of the witnesses produced, and the various physical and mental peculiarities by which the mind of the professional observer determines the degree of credit which ought prudently to be attached to oral testimony. These rules have been the subject of frequent comment in the courts, and are fully sustained by authority.

In the case of *Crane* v. *Baudouine* (55 N. Y. 256), where the question arose upon a review of facts like the present, Judge FOLGER says: "It is not the same question as if we inquired whether we should have found the same facts in the way as did the referee. It is rather, are we so certain that the

referee was in error upon the facts as that we will assume to reverse his judgment? If it appears that his conclusion is not against the weight of evidence, that it might well have been either way, or that the testimony is slight on which to found a conclusion contrary to his, then the consideration that he saw the witnesses, and had the assistance of their presence before him, uttering orally to him their testimony, should lead to a deference to his judgment." In the case of *Westerlo* v. *De-Witt* (36 N. Y. 344), Judge HUNT says: "The general disposition of the courts is to sustain the referee in his findings of fact." "This is not precisely the same question as if we were inquired of whether we should have found the same facts, and have determined the law in the same manner. It is rather, are we so certain that the referee was in error upon the facts that we will assume to reverse his judgment. If the case is doubtful his conclusions should not be reversed, if upon reading the evidence this court should be of the opinion that the conclusion might well have been either way, then the fact that the referee saw the witnesses, heard them testify, and had the nameless opportunities of judging of their character that personal acquaintance can only give, should induce us to defer to his judgment." (See also *Sherwood* v. *Hauser*, 94 N. Y. 626; *Parrott* v. *Knickerbocker Ice Co.*, 46 id. 361.)

We think the General Term in reversing the judgment of the trial court did not give that effect to the rule referred to in the cases cited, to which it is entitled.

It will be convenient before examining the propositions of law involved, to consider the questions of fact upon which alone the court below based its reversal, and which afforded the main topic of discussion before us. It is not within the limits of a reasonable discussion of this case, to even allude in detail to the numerous facts and circumstances appearing in the record which have influenced our determination; but it will be sufficient to refer to the broader and more general considerations, which in our judgment establish the plaintiff's right to recover.

Prior to the year 1870, comparatively few water meters were

in use in the city of New York, and a great waste of water as well as loss to the city arose from the inadequacy of the means at its command for measuring and regulating the supply. The great benefit to be derived by the defendant from the use of instruments for measuring the delivery of water was demonstrated by the evidence of the witnesses, who showed an increase in the receipts for water, in some instances amounting to over one thousand per cent, arising from the application of instruments to measure the supply furnished the consumers. It was conceded upon the argument by the defendant's counsel that it was a matter of urgent necessity on the part of the city government to provide means whereby the existing and long-continued waste of water should be diminished, and the causes thereof discovered and brought within the control and supervision of its officers, in order that its consumption should be regulated, and its use ratably compensated for. Out of this public necessity sprang the act under which the contract in question was made. In the session of the legislature of 1870 many acts, as well as a charter for the government of the city of New York, originated and passed; and among them was the act which included in its provisions the grant of authority to the commissioner of public works to purchase and employ water meters for that city. Section 13 of chapter 383 of those laws reads as follows: " The commissioner of public works is hereby authorized, in his discretion, to cause water meters of approved pattern and suitable for the purposes to be designated by said commissioner to be placed in all stores, work-shops, hotels, manufactories, public edifices, at wharves, ferry-houses, stables, and in all the places in which water is furnished for business consumption by the department of public works, so that all water so furnished therein or thereat may be measured and known by the said department, and for the purpose of ascertaining the ratable proportion which consumers of water should pay." It was further provided that " all expenses of meters, their connections and setting, water rates and other lawful charges for the supply of Croton water shall be a lien upon

the premises where such water is now supplied, as now provided by law."

By section 5, chapter 213 of Laws of 1871, it was further provided that "the moneys collected for expenses of meters, their connections and settings," "shall be applied by the commissioner of public works to the payment of expenses incurred in procuring, connecting and setting said meters, and the comptroller of the city of New York is hereby authorized and directed to raise on revenue bonds, in anticipation of the collection of the moneys provided to be collected as aforesaid, such amounts as may be necessary to meet the expenses incurred in procuring, connecting and setting said meters, and pay for the same on the requisition of the said commissioner of public works."   Some question has been made whether these acts conferred power upon the commissioner of public works to enter into a contract for the purchase of meters for the city; but we are of the opinion that this power was clearly intended to be given by the act.   The provisions in section 13 which authorized the commissioner of public works to cause water meters to be placed in the premises therein designated, and makes the expense of so doing a lien upon them, in favor of the city, similar to that imposed for other water charges, imply not only an authority on the part of the commissioner to create a liability against the city for their purchase, but also an ownership by the city of the meters so bought and placed.   The right of ownership implies the power to acquire, and that power can be exercised only through the agency of contract obligations.   The power conferred by the act could be effectually exercised by the commissioner only upon the assumption of his authority to procure by purchase the article required, and his ability by reason of its ownership to introduce it into the places described.   The creation of a lien for its price can be sustained only upon the theory that the lienor was the owner of the property sold, and was entitled to enforce the lien for its price.   Any other construction of the act would enable the consumer to nullify its provisions by refusing to comply with the requirements of the commissioner, and render

him powerless to execute the authority clearly conferred. The rule which requires statutes to be so construed as to confer by implication the powers necessary to carry into effect the main object of the enactment would seem to have its correct application in this case. This view of the statute has heretofore been taken by the General Term, from which this appeal comes to us, in the case of *People, ex rel. Navano,* v. *Van Nort* (64 Barb. 205). The case of *People, ex rel. Navarro,* v. *Green* (2 N.Y. Sup. Ct. [T. & C.] 62) held the same doctrine, and seems to us to be the necessary and natural interpretation of its provisions. However this may be, the subsequent amendatory act removes all doubt on the subject by expressly recognizing the liability of the city for the meters so purchased, and imperatively directing the comptroller to raise, through the negotiation of revenue bonds, "such amounts as may be necessary to meet the expenses incurred" in procuring meters, and requiring him to pay for the same upon the requisition of the commissioner.

This act gives a legislative construction to the prior statute, and clearly assumes the validity of contracts made by the commissioner in the purchase of water meters, and the liability of the city therefor. Under these acts it became the duty of the commissioner of public works to exercise the authority conferred upon him, and he could omit it only at the hazard of a prosecution for neglect of official duty.

The enactment of this statute created a law, binding and obligatory upon all of the people of the State, and exempt from any evasion of its provisions, either by an inquiry into the character of the agencies by whom it was enacted, or the motives which inspired their action.

The validity of a statute, enacted in conformity with the provisions of the Constitution, cannot be assailed, or its obligations impaired by an inquiry into the motives of the individual members of the legislature who favored its adoption, or an offer to show that its passage was procured by fraud and conspiracy. (*People, ex rel. Bolton,* v. *Albertson,* 55 N. Y. 50; *People, ex rel. Wood,* v. *Draper,* 15 id. 532.)

It has been argued that the provisions of chapter 308 of the

Laws of 1861, requiring all contracts on behalf of the mayor, aldermen and commonalty of the city of New York to be awarded to the lowest bidder, deprived the commissioner of public works of authority to make the contract in question, except upon an advertised letting, and then only with the person offering to furnish the articles at the lowest price. The repugnancy existing between the power conferred by the act of 1870, and the provisions of this act indicate an unmistakable intention on the part of the legislature to relieve the commissioner of public works from the restrictions contained in that act, when executing the powers conferred by the act of 1870. The authority given to the commissioner to designate water meters of approved pattern, to be introduced by him in the places described, is totally irreconcilable with a requirement that he should contract with the person offering to sell meters at the lowest price, for in that event he would be deprived of any discretionary power in the selection of the article to be purchased.

It also appears from the contract that the Navarro meter was patented, and the evidence shows what is indeed apparent from the character and nature of the article that inventions for the measurement of water are uniformly patented by their owners, and are purchasable only from the person owning the patent or his assignees. It is obvious also that the price of the article may be no criterion as to its usefulness or value. Under such circumstances it has been frequently held that provisions of law requiring contracts on behalf of a municipal corporation to be let to the lowest bidder are not obligatory upon its officers on account of their inherent inapplicability to the nature and circumstances of the case. If a desired article can be obtained from one person alone it would be not only a farcical, but also a hazardous proceeding to subject the city to the obligation of making a contract at the lowest price offered, when there was but one person who could lawfully bid for the privilege of sale. Such a construction might compel a contract for a price dependent upon the arbitrary will and caprice of one only of its parties.

The object and design of the restriction is wholly inappropriate to the circumstances attending this contract, and can be made to apply to it only by disregarding its plain purpose and intent. Similar provisions have heretofore uniformly been held to be inapplicable to contracts of the character in question. (*In re Dugro*, 50 N. Y. 513; *Harlem Gas Co.* v. *Mayor, etc.*, 33 id. 309; *People, ex rel. Navano*, v. *Van Nort*, 64 Barb. 206; *People, ex rel. Smith*, v. *Flagg*, 17 N. Y. 584.)

We think that the clause in question was not only inapplicable, but that it was also repealed *pro tanto*, by implication on account of its repugnancy to the act under which this contract was made.

Although the original act was passed April 26, 1870, no steps were taken to carry it into effect until three months thereafter. In July, 1870, the department of public works issued a general invitation to all manufacturers of water meters, wherever located, to present their inventions to that department, with the view of having tests made for the purpose of determining the kind and character of meter to be adopted for use by that department. This invitation was not only extensively published in the city papers, but circulars were prepared and sent to all known manufacturers of such instruments. No reasonable means seem to have been omitted to give publicity to the invitation, and secure the competition of the best instruments, and it was largely and generally responded to by persons interested in the subject.

Mr. Navarro, who was concededly a gentleman of unblemished reputation in his business as a manufacturer and inventor, presented six different styles of meters for competition. He was apparently a man of wealth and responsibility, who had for several years been engaged in the business of manufacturing water meters, having bought some patents for improvements, and invented others; and seems to have been drawn into the competition by natural qualification and legitimate existing business interests. The subject of testing these meters was naturally placed under the supervision of Edward H. Tracy, chief engineer of the Croton aqueduct department, as also of the department of public works, and was begun by him upon

a public competition about the 1st day of October, 1870, and carried on continuously until the 1st day of January, 1871. During this time forty-eight different styles of meters, among which those belonging to the plaintiff's assignors, were tested and examined under the supervision of experienced and competent engineers ; and the examination resulted in the adoption by the chief engineer of the meter in question.

No circumstances appear in the evidence justly reflecting in any degree upon the fullness, fairness and freedom of the competitive trial, and it was proved upon the trial, assumed by the court below, and conceded upon the argument before us, that the experience, integrity and skill of the chief engineer conducting this experiment were unquestionable.

Upon the conclusion of the test that officer made his report to the commissioner of public works, in the following language:

"DEPARTMENT OF PUBLIC WORKS,
CHIEF ENGINEER'S OFFICE, 235 BROADWAY,
NEW YORK, *December 31st*, 1870.

Hon. WM. M. TWEED :

SIR — I have, under your instructions, erected suitable fixtures for testing water meters and examined and tried forty-eight. In the examination the qualities sought for were accuracy of measurement, strength and durability, with simplicity, cheapness of construction, and which offered but little impediment to the flow of water. A great amount of mechanical capacity and skill has been shown in the construction of meters presented for trial, many of them being beautiful specimens of works of art, and fulfilling most of the requirements. The meters presented for trial by Mr. Jose F. Navarro, called the vibrating single piston meter, is a very compact machine, simple in its construction and easily repaired and adjusted. It takes but a small force to run it, measuring the water with great accuracy, and *in my opinion* answers the requirements more nearly than any other meter presented for trial.

Respectfully yours,
EDWARD H. TRACY,
*Chief Engineer, Croton Aqueduct.*"

Such a certificate proceeding from the department desig-
nated by law as the appropriate tribunal to determine questions
of the character presented, for the information and action of
the other officers of the city government, and being concededly
beyond the reach of improper influences, would seem to go
very far in relieving them from the imputation of corrupt
motives in selecting the instrument recommended, even if it
did not impose upon them the obligation of making that selec-
tion.   Certainly the choice of another instrument by the com-
missioner of public works would, under the circumstances, have
justly rendered his motives liable to grave suspicion.   This
recommendation resulted in the execution of the contract set
forth in the complaint.   This contract was conceded to be care-
fully framed to guard the interests of the city, and was drawn
and approved by the chief engineer of the department of pub-
lic works.

After this meter had been approved and in contemplation
of the contract, Mr. Navarro organized a corporation consisting
entirely of practical manufacturers, to whom the contract when
executed was transferred, and who undertook its performance.

This corporation upon its organization immediately com-
menced making preparation for the manufacture of the.meter,
and actually expended, as was proved by the defendant, in the
purchase of lands, manufactories, machinery, tools, materials
and labor, for the purpose of performing their contract, at least
the sum of $550,000, exclusive of liabilities for current ex-
penditures.

This sum represented eleven-fourteenths of the entire amount
agreed to be paid for the meters by the city, and was quite an
extraordinary expenditure, if the contract be considered as a
mere scheme to defraud the defendant.   The interest which
each of the co-partners had in the expenditures of this corpora-
tion, would seem to have rendered it difficult for Mr. Navarro,
even if he had the inclination to do so, to have withdrawn
any considerable amount from its funds, to be used for the pur-
pose of official corruption.

The plaintiff's assignor, having caused the contract to be

fully performed, and the city having accepted such perform-
ance, upon their refusal to pay the contract price, assigned
his claims; and his assignee brought this action in the fall of
1873 to recover the amount due thereon.

It was not claimed, in the opinion of the court below, or by
the defendant on the argument before us, that any direct or
positive evidence was given upon the trial showing fraud
or collusion between the plaintiff's assignor and the commis-
sioner of public works, or any other city officer, either in pro-
curing the adoption of the Navarro meter by the city, or in the
making of the contract for its purchase, or any promise or
agreement to divide either the proceeds or profits of such con-
tract with any such officer, or with any persons representing
them; nor of any actual division of profits or proceeds with
such persons; on the contrary, the testimony of all the wit-
nesses examined on the trial, who from their relations to the
subject, would naturally have had knowledge of the fraudulent
practices charged, if they had existed, repelled such charge in
unqualified terms.

It was attempted to overthrow this positive evidence and
establish affirmatively the existence of fraud by circumstantial
evidence alone. Prominent among these circumstances was al-
leged exorbitancy of price, unnecessary quantity purchased,
and imperfections in the meters delivered under the contract.
The main feature in the evidence upon which the allegations
of fraud were based is undoubtedly the alleged exorbitancy of
price agreed to be paid for the property purchased.

If this charge is not sustained by the testimony, all motive
for the fraud disappears, and the foundation of the defense is
subverted.

This fact is from its very nature susceptible of abundant
proof at any time and capable of almost absolute demonstration,
and no reason exists why those who assert its existence should
leave the question in doubt. The evidence on the part of the
defendant upon this question consisted of estimates as to the
value of the machines, by several experts of varying degrees of
intelligence and experience, none of whom, however, had ever

manufactured meters similar to the one in question, but who were all more or less familiar with the manufacture of mechanical implements and workings of brass and other metals.

These estimates varied largely and ranged from $15 to $65 for each meter, thus bearing upon their face the evidence of want of knowledge and care on the part of some of the witnesses in forming them. Mr. Worthington, who was called as a witness by the defendant, and appeared to be a dealer of large experience and intelligence in the manufacture of meters and other mechanical inventions, and the owner of a patent for an improvement in water meters which had theretofore been quite extensively introduced and used in New York as well as other cities, testified that his meter was made of cast iron and was not well adapted to be made of brass, but that he should have charged in 1871 $65 each for similar meters made of brass. In a subsequent part of his testimony he states that, upon a careful estimate of the cost, he would have made ten thousand meters in brass, of fifty gallons capacity, under his patent in 1871, for $56.50 each, excluding any charge for royalty and including the cost of a box. The evidence of this witness, not only from his apparent experience, candor and intelligence, but also from the careful manner in which his estimate was made, is, we think, entitled to great weight upon the question in dispute.

It appeared in evidence that the city prior to this time had mainly used the Worthington meter at a cost to it of $70 for each, and that the value of meters varied much, depending upon the kind and quantity of material used, the character of the workmanship employed, and the amount of labor required in constructing them.

The Navarro meter was proved to have been made of the finest quality of brass, a material best adapted to the purpose, to consist of many separate parts, of much delicate mechanism, and was finished with great mechanical skill.

It was urged on the argument by the defendant's counsel that the cost of these instruments could not have exceeded $55 each, inasmuch as the entire sum of money invested by its

manufacturers to produce them amounted only to about $550,000; it was, however, also claimed by him that some considerable part of that investment still remained in real estate and tools, bought indeed for the purpose of carrying out the contract, but still being of value, and should be deducted from the cost of the meters in estimating their value.   No testimony, however, was given of the value of that property, and we have no means of .determining what deductions should be made, if any, on that account.

The evidence showed that large sums of money had been expended by Mr. Navarro not only for the purpose of manufacturing the meters but also in purchasing outstanding patents in order to protect his invention and shield himself from interference and prosecution upon the claims of rival inventors. The evidence of the workmen manufacturing the meters showed by proof of the quantity used and its market price, that the actual cost of the material entering into their manufacture exceeded the estimate put upon the entire machine by most of the defendant's witnesses.  A mechanic engaged in the manufacture of some of the first instruments made under the contract testified that their cost then exceeded $100 each, and others gave estimates tending to show that they could be manufactured in large quantities at a cost of not less than $60 or $65 each, exclusive of any charge for royalty upon the invention. We are inclined to place greater weight upon the evidence produced by the plaintiff in connection with that given by Mr. Worthington as to the value of these meters than that given by other witnesses for the defendant.   It is more specific in its character, given by persons having more intimate knowledge of the subject, and according more nearly with the market price of similar machines at the date of purchase.

The defendant's witnesses greatly erred as to the character, cost and quality of the material entering into the composition of these machines and did not take into account the value of the several inventions which went to make up its completed form.

We are of the opinion that if we allow a reasonable royalty

which an inventor is fairly entitled to on account of the skill and labor employed in the invention, that there is no such discrepancy between the cost of the meter and the contract price as furnishes evidence of a fraudulent motive in establishing the price, and no such extravagance as would naturally yield a fund liable to be used for purposes of corruption.

A large proportion of the time of the trial court was taken up with the evidence of experts relating to the mechanical and scientific questions involved in a comparison of the qualities of various water meters and the results of the several experiments made therewith; although, in view of the condition of the case and the questions authorized to be raised on this branch of it by the pleadings, we do not think it has a conclusive bearing upon the result, we yet feel constrained to devote some attention to the discussion of the questions thereby presented.

The voluminousness of this evidence will, however, preclude any extended reference to the various theories presented by the witnesses, and in view of the circumstances we do not regard it as necessary to state any thing more than the general conclusions reached on this branch of the subject.

This evidence is now claimed to be important as bearing upon the following views of the case.

*First.* As affording a basis for a presumption of fraud arising out of the alleged worthlessness of the Navarro meter as a water measuring instrument.

*Second.* As showing non-performance of the contract by the plaintiff on account of the uselessness and imperfections of the property delivered in performance thereof.

*Third.* As an element in establishing the counter-claim now urged on behalf of the city against the demand of the plaintiff.

In this connection we have to do only with the two grounds first stated.

The main if not the sole object to be obtained by the use of water meters in New York is to enable the city to discover with comparative accuracy the relative proportions of the element

used, with a view of charging a ratable compensation therefor to its several consumers. In this view it is comparatively unimportant whether a given machine records with mathematical exactness the volume of water flowing through it, but it is important that it should run with itself, or, in other words, that it should operate under the same conditions in different places with uniform results, and that it should record the quantity of water passing through it with reasonable accuracy. In this manner the relative proportion in compensation would be kept up among its various consumers. Next to this quality it is desirable that machines for that city should impede as little as possible the flow of water, so as not to interrupt its free passage to the highest point of delivery attainable under its natural head in the various parts of the city.

The inferior force or head pertaining to the water supply in New York renders it very desirable that its flow should be as little obstructed as possible with a view of affording a more extended theater for its consumption. After this comes the economy with which the instrument may be furnished and run. This question involves a consideration of the original cost of the machine, its durability, simplicity of construction, with a view to easy repair, and the exchangeability of its various parts with reference to convenience in replacing any damaged portion of the instrument.

The evidence seems to show that invention has been exercised for many years toward the production of a perfect water meter, but that the requisites for such a machine are so conflicting and irreconcilable that a perfectly satisfactory result has not yet been attained. The difficulty of constructing a meter that will work so closely as to prevent all leakage of water, and yet be so free in its movements as to obviate friction, and operate under the slightest pressure, or that shall be delicate enough to record the passage of inconsiderable quantities and yet strong enough to resist the application of an almost irresistible force, seems to present a problem not easy of solution. Machines which have been found perfect in some respects have always been found defective in others, and the

leading object recently seems to have been to attain comparative perfection in the indispensable qualities, combined with the smallest degree of imperfection in the qualities of inferior importance.

The various demands upon the faculties of inventors are so much at war with each other that it is by no means certain that the machines now in use have not attained their highest possible degree of perfection. It is reasonably certain, we think, from a careful examination of the evidence and the opinions of the various experts called, that the Navarro meter combines in a high degree the essential requisites of a good water meter and compares favorably with the record presented of the operation of other meters. A decided preponderance of testimony shows that in freedom from obstruction to the flow of water, simplicity of construction, the ease with which it can be taken apart and repaired, and the accuracy and uniformity with which it records the passage of water, it is well adapted to its purpose and furnishes a good practical measuring instrument. Upon the evidence before us, while we are not called on to pronounce upon the comparative merits of the various machines which were submitted for competition to the city inspector, we can say, without hesitation, that the selection of the Navarro meter did not indicate, from its inferiority to others, the presence of corrupt motives, to account for its adoption.

In arriving at the results indicated, we have not placed reliance upon the experiments made with this machine in Brooklyn, since it was conceded by one of the board conducting them, that they were not claimed as tests of any quality except that of endurance, and for that purpose we think the force applied and the circumstances under which it was done was far in excess of any thing required by a reasonable interpretation of the contract. The evidence showed that any meter whatever, subjected to the force then applied, under the same circumstances, would inevitably have been broken and destroyed, and the instructions under which the experiment was conducted indicated an intention to accomplish that result.

It was also insisted upon the argument that the purchase of so

large a quantity of unproved meters indicated a fraudulent intent on the part of the purchaser. The number of stations in New York embraced in the description of places in which the commissioner was authorized by the statute to establish water meters does not directly appear; one witness says they were estimated to exceed twenty thousand. In the absence of evidence to the contrary it may be assumed that they were largely in excess of the number of meters contracted for. Assuming, as we must, that the approval of the character and quality of these meters by the city engineers was a sufficient warrant for their adoption by the commissioner for use as approved meters, we see no reason in the number ordered which authorizes any court to review the discretion exercised by the commissioner in determining the number required.

The statute clearly invested him with a discretion to decide where they were to be placed, and the number required, and there are no facts appearing in the case upon which a court is authorized to say as matter of law that the number purchased was unreasonable or indicated an intent to defraud. (*Walker* v. *Devereaux*, 4 Paige, 251.)

Even a mistake of the commissioner in this particular could not be deemed any thing but an error of judgment on the part of the officer exercising the power, which should not be allowed to affect the rights of an innocent party contracting with a public officer acting under a public statute, and within the limits of his legal authority.

It should constantly be borne in mind that the charge of fraud in this case imputes the commission of a crime to all of those persons connected with the transaction and involves the conduct, not alone of the commissioner of public works, but also that of the plaintiff's assignor, and the chief engineer of the Croton aqueduct department, upon whose recommendation the property in question was purchased. This crime must be proved. Its commission cannot be presumed, and although it may be established by circumstantial evidence, it must be by the proof of such circumstances as are irreconcilable with any other theory than that of the guilt of the persons accused.

No different rule prevails in respect to the contracts of corporations than that applicable to the contracts of private individuals, and we must determine the rights involved in this action by the light of the same principles which experience has shown to be salutary in other cases. (*People* v. *Stephens*, 71 N. Y. 529.) In the case of *Kingsley* v. *City of Brooklyn* (78 id. 215), it was said by Judge MILLER: "Allegations of fraud against public officials, without proof of facts establishing their guilt, are of but little avail in avoiding a contract in a court of law. To set aside a contract on any such ground, and to' justify a court in holding, as matter of law, that it is void, the proof should be explicit, clear and conclusive." It was said by Judge FINCH, in the case of *Shultz* v. *Hoagland et al.* (85 N. Y. 467): "The case furnishes no exception to the rule that fraud is to be proved and not presumed. (*Grover* v. *Wakeman*, 11 Wend. 188.) It is seldom, however, that it can be directly proved, and usually is a deduction from other facts which naturally and logically indicate its existence. Such facts, nevertheless, must be of a character to warrant the inference. It is not enough that they are ambiguous and just as consistent with innocence as with guilt. That would substitute suspicion as the equivalent of proof. They must not be, when taken together and aggregated, when interlinked and put in proper relation to each other, consistent with an honest intent. If they are, the proof of fraud is wanting." Circumstantial evidence is defined to be, "an inference as to the existence of a fact not actually known, arising from its necessary or usual connection with others which are known." (1 Phillips ρn Evidence, 599, note 177.) Aside from the evidence upon which we have heretofore commented, we think that upon which the court below acted in reversing the judgment comes fairly within the condemnation of the authority cited. It does not seem in any respect to reach beyond the region of conjecture, and, at most, to suggest only reason for suspicion. This falls far short of that proof upon which the judgments of a court of law should alone be pronounced, and certainly affords no sufficient ground for an appellate tribunal

to reverse findings of fact made by a trial court and founded upon positive evidence.

In order that we may do no injustice to that court, we will give a statement of the considerations influencing them, in the language of the learned judge writing the opinion. Speaking of the relations of Frear to the subject, he says : " His presence during the tests, his apparent interest in the success of Navarro's meter, his frequent presence in the establishment when it was being manufactured, the fact that the duties of his own office, as a commissioner of charities and correction, would not take him there, and his co-operation in the efforts that were made to introduce the meter in the city of Washington, where it is stated by the witness Crane, it was mentioned as desirable that it should be introduced for the purpose of justifying Tweed in making a contract for its manufacture and introduction in the city of New York, which he declined to do previous to its introduction and use elsewhere, all combine in support of the conclusion that this contract was not only obtained from Tweed through the influence and intervention of Frear, but that he had become a party interested in its success, and that they were willing to resort to improper and corrupt means to secure the adoption of the meter, may be inferred from the statement of the witness Crane, that Mr. Navarro's agent, Greene, when he was in Washington, offered Crane $650 apparently to secure his friendly offices in favor of the introduction of this meter there."

The evidence of the witness Crane referred to related to the declarations of one Green, who was employed by Navarro to sell his meter to the city corporation and war department at Washington, and also introduce it into cities other than New York. The character of the witness Crane was assailed upon his cross-examination, and he confessed that his nomination to the office of water register of Washington had been rejected by its common council upon allegations against him of official corruption. The manner and appearance of this witness were subjected to the scrutiny of the referee, and he, as we think, properly refused to credit his evidence. A conclusive reason

also appears for discrediting the evidence of Crane in the fact that it related to the declarations of a stranger to the subject of this action, who was not authorized to speak for any of its parties. The evidence was objected to by the plaintiff on that ground, and was so far removed from the scope of any proved agency of Green's, as to be clearly inadmissible as against the plaintiff.

Within the doctrine of *People* v. *Davis* (56 N. Y. 95), we think the evidence was improperly considered by the General Term, and as it embraced the only testimony in the case which even squinted at dishonest conduct, we conjecture that it was allowed an undue weight in their consideration of the case.

Assuming upon conflicting and, as we have shown, insufficient evidence that the price paid for these meters was corruptly extravagant, the court below proceeded to infer, not only an unlawful conspiracy in obtaining the contract, but also a corrupt agreement to divide the anticipated profits therefrom, solely because of the social and political intimacy existing between the commissioner of public works and Frear, and a business and perhaps social intimacy between Frear and Navarro. Navarro and the commissioner of public works were at all times comparative strangers to each other, and the only link between them is attempted to be supplied by their alleged mutual connection with Frear. The entire scope of the evidence shows simply that the parties enjoyed relations which gave them an opportunity to conspire, but utterly fails to show, either by evidence or legitimate inference, that the conspiracy was formed or the fraud committed. The relations existing between the parties, while they may have been the cover for fraudulent practices, are still consistent with entire innocence of fraudulent intent, and are explainable upon natural and obvious grounds.

Navarro's acquaintance with Frear commenced long before this transaction, and from the year 1867 until the time of making this contract he had been in the habit, either personally or through the corporations with which he was connected, of loaning money to Frear. These loans were always secured to the lenders by the deposit of collaterals by Frear, and no

practical difference with reference to the course of dealing between them, took place after the making of this contract. The evidence shows that Frear was under obligations to Navarro for these loans, and had for many years been in the habit of occasionally calling upon him at his place of business. It was shown that he intended to take an interest in the introduction of Navarro's meters in other cities than New York, but it also showed that his interest was hostile to that of Navarro's in that city, since he had even subsequent to the recommendation of Navarro's meter by Tracy become a part owner in another patented meter, which the owners were endeavoring to sell to the city, and his interest was dependent upon his success in influencing the city to become its purchaser. The adoption of this meter by the city, if Frear could have procured it to be done, would probably have given him a much larger interest than any which he could have obtained through Navarro.

No evidence, however, is produced showing that Frear ever used any influence with Tweed to secure the adoption of the Navarro, or any other meter, and it is not claimed that he or any other person could, even if they had desired, have affected the judgment of the chief engineer of the Croton aqueduct department in passing upon the relative merits of the meters submitted to him for examination.

The concessions made by all parties as to the integrity of the chief engineer seems to present an insuperable barrier to the imputation of the use of improper influences in securing the selection of the Navarro meter by the department of public works.

Under all of the circumstances we do not think there was legal evidence in the case upon which a court of law had a right to pronounce judgment depriving the plaintiff's assignor of his rights of property, and entailing upon him the loss of the large sum which he had concededly invested in the performance of his contract.

The notoriety of the conduct, and the universal conviction entertained by the public as to the vicious and corrupt character of Wm. M. Tweed, has been urgently pressed upon our atten-

tion as corroborative evidence of the fraud charged, and as affording a strong presumption of misconduct in any official transaction with which he was connected.

The court, of course, cannot be ignorant or unconscious of the widespread reputation which that individual achieved as the most daring, reckless and unscrupulous peculator of any age or country, and the probability that many of his acts, which have heretofore remained unquestioned, were inspired by corrupt motives and unlawful desires, yet it remains, nevertheless, true that no evidence is produced that the contract now in question was procured by fraudulent inducements,·and that for many years Tweed was the official agent of the defendant, voluntarily selected by its lawful authority, and necessarily represented it in the transaction of its numerous and important dealings with the public during a long course of years.

It is not competent for a municipal corporation, any more than for a private individual, to relieve itself from its contract obligations by assailing the general character and reputation of its lawful agent, or to repudiate the performance of its promises on the ground of the infidelity of its agent in other transactions.

Under all circumstances it is the duty of a court to subject the conduct of public officials, when judicially investigated to even jealous scrutiny, with a view of discovering and preventing abuses of public trusts; but if, after patient and elaborate investigation, no legal proof of fraudulent misconduct is discovered, it is the duty, and we hope will always be the practice, of a judicial tribunal, to determine the rights of the parties in accordance with the law, independent of all other considerations.

Time only can determine whether the defendant has been defrauded in the execution of this contract, or had imposed upon it an imperfect and worthless article at an exorbitant price by collusion between its agents and other persons. We can only say that the evidence in the case does not demonstrate such a result, or render it probable that injustice has been done

to the tax payers of the city by the purchase of the meters in question.

Even, however, if we could upon the evidence come to a different conclusion upon the question of fraud involved, it would not change the result, as we do not see how the defend-ant can escape liability after accepting and retaining the property delivered under the contract.

No evidence has been given which tends in any way to qualify the legal effect of the acceptance of the property, which was not only established by the evidence nut was also admitted in the answer. The rules applying to this branch of the case are elementary, and an answer to them has hardly been at-tempted by the appellant.

It is the duty of a party who has been induced to enter into the making of an executory contract for the purchase of per-sonal property, through fraud, if he desires to avail himself of that objection, to act upon the first opportunity and rescind it by repudiating its obligations and restoring whatever has been received under it immediately upon discovering the alleged fraud. If he delays acting, and retains the property delivered beyond a reasonable time to act, or accepts performance after such discovery, he is held to have ratified the contract and waived his objections thereto. Such a contract is not void but is simply voidable at the option of the party defrauded, and requires affirmative action on his part to relieve himself from its obligations. In *Burton* v. *Stewart* (3 Wend. 237), it was said by Justice MARCY : "But a party to a fraudulent contract may, however, so conduct himself in relation to it, as to forfeit his right to treat it as void," " the defendants could not treat the contract as void after retaining the possession of the prop-erty received under it. Had they intended to treat the con-tract as void on the ground of fraud, it was their duty when they discovered the mare was not such as the plaintiff repre-sented her to be, to have returned her to the plaintiff." It was held in *Cobb* v. *Hatfield et al.* (46 N. Y. 536), where a party had bought a twelfth interest in the property of a cor-poration from certain individuals, and after the discovery of a

fraud practiced upon him by his vendors, had voluntarily accepted certificates of stock from the corporation to represent his interest, that he was estopped from rescinding the contract.

Judge ALLEN said : " The law not only requires a disaffirmance of the contract at the earliest practical moment after the discovery of the cheat, but a return of all that has been received under it, and a restoration of the other party to the condition in which he stood before the contract was made.  To retain any part of that which has been received upon the contract is incompatible with its rescission," citing *Masson* v. *Bovet* (1 Den. 69) ; *Voorhees* v. *Earl* (2 Hill, 288) ; *Hogan* v. *Weyer* (5 id., 389).  In further illustration of the rule we may cite *Welles* v. *Yates* (44 N. Y. 530) ; *Lindsley* v. *Ferguson* (49 id. 625) ; *Hammond* v. *Pennock* (61 id. 153). Applying the doctrine laid down in these cases to the conceded facts in this case, we see no escape from the conclusion that the defendant is barred from alleging fraud as a defense to this action.

The contract having been made in August, 1871, about four thousand of the meters were tested at the plaintiff's factory by the defendant's agent, and were delivered at the defendant's pipe yard, the place specified in the contract for delivery, and were accepted by it in the fall of that year.   In January, 1872, Van Nort succeeded Tweed as commissioner of public works, and the performance of the contract went on from that time to July 1, 1872, when the delivery of the whole number of ten thousand had been completed and they had been accepted by the defendant without objection.   From that time to the trial of the action, a period of several years, this property has been retained by the defendant, and it has not only omitted to return it, but has never offered to do so, or notified the plaintiff to remove it from the yard.

Subsequent to the delivery of this property, and in the fall of 1872, Navarro commenced proceedings against Van Nort in the Supreme Court to compel him by *mandamus* to issue a requisition upon the comptroller of New York, for the payment of the contract price of such meters.   This proceeding was re-

sisted by Van Nort, but resulted in an order granting the *mandamus*. (*People, ex rel. Navano, v. Van Nort,* 64 Barb. 206.) This litigation was carried on by the privies of the respective parties to this action, and its adjudication barred them from raising, in any subsequent litigation, any of the questions determined in that proceeding.

The questions as to the delivery of the property and its acceptance by the defendant were necessarily involved in the decision of that proceeding, and their determination there operates as an estoppel upon the parties in this action from again contesting the questions of acceptance and performance. In pursuance of the order of the court two requisitions were issued by the commissioner of public works, upon the comptroller of the city, directing him to pay the amount called for by the contract to Mr. Navarro, and they were delivered by such commissioner to the plaintiff's assignor, and by him were assigned to the plaintiff. The requisitions were issued upon, and were accompanied by statements of the account for said meters certified as being correct by the authorized agent of the defendant, and among which was the following, under the date of January 6, 1873: "I hereby certify that I have examined the above account and believe it to be correct; that the articles were necessary, and have been received by the department of public works for the use and on account of the city of New York; that the prices charged are just and reasonable, and such services as are therein specified have been properly performed; and that said articles have been or will be used for, and applied to the service, and for the purposes of the mayor, aldermen and commonalty of the city of New York; and that the payment of the amount of said account will not exceed the unexpended balance of the sum duly appropriated by law for the purposes therefor.

GEO. M. VAN NORT,<br>
*Commissioner of Public Works.*"

The authority of the commissioner of public works to bind the defendant by an acceptance of the property purchased

follows as a necessary consequence from the power imposed upon him by the statute to purchase the property and appropriate it to the use of the city. Indeed, under the authority conferred by the act, no other officer of the city could lawfully interpose and control him in the exercise of the power conferred upon him of buying, receiving and using this property. As was said by Judge ALLEN in *The State* v. *Stephens* (71 N. Y. 529): "The State is not in tutelage as one incapable of acting *sui juris*, but has capacity to act in all matters by its representatives and agents, and is bound by the acts and admissions of its duly appointed and recognized officers acting within the usual scope of their power."

Aside from the admissions of the answer, the fact of acceptance by the defendant seems conclusively proved, and this was the view which its counsel seemed to take on a former appeal of the case to this court. The printed brief then used contains these expressions: "The goods are in this position: They have been delivered and accepted by the vendee, and it is submitted that the right to return never exists after an acceptance by the vendee."

The only answer suggested to the conclusive character of this acceptance was the claim that when the acceptance is that of an agent who acts under the influence or authority of the party guilty of the original fraud, the act of acceptance is vitiated by the same fraud which nullifies the contract. Doubtless this would be so, but the principle has no application to the facts of this case. The evidence here shows that the great bulk of the property purchased was delivered and accepted after a change in the city government of New York induced by the fraudulent practices of its former authorities, and with ample notice to the parties accepting of the facts constituting the fraud, if such existed.

The agency of Tweed and Frear in making the contract, extravagance in the number of the meters ordered, their imperfections, if any they had, and the exorbitance of price, if it was exorbitant, were as well known to all of the officials of the defendant when the six thousand meters were delivered and

accepted in 1872 as at any subsequent time; and ignorance of the circumstances attending the execution of this contract which excited suspicion cannot be predicated of any of defendant's agents as late as July, 1872, when the performance of the contract by the plaintiff was accepted as complete by the defendant.

The allegations of fraud consist of inferences sought to be deduced from the circumstances stated, and the mere omission of the officers to draw those inferences do not constitute that ignorance which excuses the long-continued inaction of the defendant found in this case.

The liability of the defendant for the payment of the price agreed upon is thus established independent of any action involving the conduct of Tweed in connection with this purchase.

It was urged on the argument before us that the order for a new trial should be affirmed for the purpose of affording the defendant an opportunity of presenting a counter-claim for damages, on account of alleged defects and imperfections in the meters delivered. A number of answers to this contention of the defendant suggest themselves which seem to be conclusive against it. The affirmative findings of the referee show that the meters delivered conformed in quality and character to those described in the contract; and this finding we have before shown is in accordance with the evidence in the case, and is not questioned in the opinion of the General Term.

But even if there had been evidence upon which a claim for a breach of a warranty in respect to the quality of the article sold could have been based, and such warranty survived the acceptance of the property, no foundation was laid on the trial for raising that question in this court. The facts out of which a counter-claim might arise were set up in the answer by way of defense alone, and not as a counter-claim; and no damages on that account are claimed therein, or found on the trial. The referee was not called upon to pass upon the question, and his omission to do so was not made the subject of request or exception by the defendant. Under these circumstances it

is not available for a party to raise such a question, in the first instance, in an appellate court.

The rule that judgment should be rendered in accordance with the allegations and proofs of the parties is fundamental in the administration of justice, and precludes a party from having any relief not claimed or proved. ( *Wright* v. *Dela-field*, 25 N. Y. 268.)

The only claim made on the trial on this branch of the case was that the proof of the imperfection of the meters constituted a bar to the plaintiff's action, and under established rules, he should now be confined to the questions there raised. (*Home Ins. Co.* v. *West. Trans. Co.*, 51 N. Y. 93 ; *Stapenhorst* v. *Wolff*, 65 id. 596.)

In refusing to take cognizance of a similar objection raised in the appellate court, Judge GROVER said in *Lindsley* v. *Fer-guson* (49 N. Y. 626) : " The defendants did not insist upon the trial upon any counter-claim. The only question made and decided was whether fraud barred a recovery upon the note."

The defendant's counsel seems to rest this branch of his argument upon the claim that the contract embraced a war-ranty that the article sold should be capable of sustaining the continued strain and wear of actual use ; and while affirming that the meters would not fulfill this warranty, insists in the same breath that they have never been subjected to the trial by the defendant. An extract from his brief states : " They are made for use. How well adapted to use they are can be ascertained perfectly only by trial and experience. The city has not found occasion to try them."

How damages for a breach of contract can be claimed in connection with an avowal that the property has not been sub-jected to the peril warranted against or proved to have been incapable of performing all that was promised for it, we are at a loss to understand.

While some questions remain which appear on the printed briefs, but were not orally discussed before us, it is sufficient

to say with reference to them that there are none which require serious consideration at our hands.

We have carefully examined the various exceptions taken by the defendant to the rulings of the referee upon the admission and exclusion of evidence offered on the trial, and also the various defenses to the causes of action set up in the answer, not hereinbefore referred to. These questions were, after having been carefully considered by the General Term, decided adversely to the defendant, and we concur in the results reached by it in relation thereto.

The order of the General Term should be reversed, and the judgment entered upon the report of the referee affirmed.

All concur ; MILLER, J., in result.

Order reversed and judgment affirmed.