### OREGON PAC. R. CO. *v.* FORREST *et al.*

*(Supreme Court, General Term, First Department.   May 23, 1890.)*

EQUITY—LACHES.

   Plaintiff railroad company made a contract with G., whereby the latter agreed to purchase a quantity of rails and their fastenings, and to sell the same to plaintiff on te rms therein stated, and plaintiff agreed on its part to deposit with G., as a guaranty for its performance of the contract, 3,000 of its first mortgage bonds for $1,000 each, of which G. was to retain 100 for his own use, and hold the remainder until the ties, etc., had been paid for.  G. having neglected to proceed with the contract, plaintiff authorized its president to negotiate for the cancellation of the agreement and to close the transaction.  That officer accordingly negotiated with G., and the contract was canceled, 100 bonds being retained by G. as consideration for the cancellation, a written memorandum to that effect being signed by the parties.  Interest on these bonds was afterwards paid by plaintiff for six years, when suit was instituted in its behalf to recover the bonds on the ground that its consent to their retention by G. was obtained by duress.  In the mean time, G. and his witnesses had died.  *Held*, that plaintiff's delay in seeking to be relieved from the alleged duress was fatal to the action.

   Appeal from circuit court, New York county.

   Action by the Oregon Pacific Railroad Company against George J. Forrest and others, executors under the will of Cornelius K. Garrison, deceased. From a judgment dismissing the complaint, plaintiff appeals.

   Argued before VAN BRUNT, P. J., and BARTLETT and BARRETT, JJ.

   *Joseph H. Choate*, for appellant.   *Horace Russell*, for respondents.

   VAN BRUNT, P. J.   In June, 1881, the plaintiff railroad was in process of construction, and on the 13th of that month the plaintiff made with the defendants' testator, Cornelius K. Garrison, a contract whereby, among other things, the said Garrison agreed to purchase 5,000 tons of English steel rails, deliverable in San Francisco at as early a date as reasonably practicable, and to sell to the plaintiff the rails so bought, upon arrival of each shipment at San Francisco, upon receiving in cash the actual cost to him of said rails, and the further sum of $100,000 in first mortgage bonds of said company.   Garrison further agreed to purchase the fastenings for said rails, and to deliver the same at San Francisco, at the same time, which were to be paid by the company in the same manner.   The company agreed to deposit with Garrison, as a guaranty for the performance of the contract on their part, 3,000 of the first mortgage bonds of the company for $1,000 each, of which Garrison was to retain 100 as above stated, and to hold the remaining 2,900 until the company had taken and paid for the rails and fastenings including interest and all proper charges. ' The contract also contained a provision that the company might withdraw any part of said bonds on paying to said Garrison 60 per cent. of their par value.   The company further agreed to give to said Garrison the same bonds in full-paid stock of the company upon the 100 bonds already mentioned, that they would be entitled to prorate with the most favored purchaser of any of said company's bonds.   Garrison further agreed to loan to the company an amount equal to the difference between the cost to him of said rails and fastenings and $200,000; the bonds deposited with him as above being held as security for such loan.   The company further agreed to purchase from Garrison the 100 bonds already mentioned, together with the *pro rata* of stock, and pay him therefor $100,000 at any time he might elect to sell the same to them.   Under the fifth article of this agreement the plaintiff deposited with Garrison 3,000 bonds.   On the 21st of July, 1881, the company received back 400 of said bonds.

   It was claimed by the plaintiffs that between the 13th of June and the 13th of August, 1881, Garrison took no steps to purchase the rails or other supplies referred to in said agreement, though the plaintiff's president had requested that the same should be furnished.   On the 13th of August, 1881, at

a meeting of the executive committee, which by the by-laws of the company possessed all the powers and duties of the board of directors when the board was not in session, a resolution in the following language was passed: "At a meeting of the committee, held August 13th, 1881, present, T. E. Hogg, G. T. M. Davis, and N. S. Bentley, the president was authorized to negotiate with Commodore C. K. Garrison for the cancellation and abrogation of the contract existing between him and this company, with power to close the transaction on the terms proposed, in his discretion." And on the same day, 2,500 of the bonds in question were surrendered by Garrison to the plaintiff, and the following agreement was signed:

"For and in consideration of one hundred thousand dollars in bonds of the Oregon Pacific Railroad Company, and six hundred shares full-paid stock (the receipt whereof is hereby acknowledged) paid by the Oregon Pacific Railroad to C. K. Garrison, the within agreement is hereby canceled and satisfied, and the Oregon Pacific Railroad Company hereby acknowledges the receipt of twenty-five hundred bonds, of one thousand dollars each, being the remainder of the three thousand bonds mentioned in the agreement hereto annexed.

"*New York, August 13th,* 1881,                    C. K. GARRISON.
                                                   "T. EGERTON HOGG."

The agreement of June 13th was accordingly canceled, and the 600 shares of stock and the 100 bonds referred to were retained by Garrison. The plaintiff thereafter paid to Garrison, or his assignee, during his life-time, the interest coupons on the 100 bonds so delivered to him semi-annually, and for over two years after his death paid the interest to his executors in the same way. The first of these payments was made on the 1st of October, 1881, and the last on the 3d of October, 1887. Cornelius K. Garrison died on the 1st of May, 1885. His son William R. Garrison, who held his power of attorney, died on the 1st of July, 1882, and Mr. Mortimer Ward, who succeeded William R. Garrison as attorney of said Cornelius K. Garrison, died on the 13th of August, 1884.

In October, 1887, this action was brought to recover the said 100 bonds, or for their value in case a delivery could not be had; the ground of recovery claimed upon the trial being that the consent of the company to the delivery of the bonds to Garrison had been obtained by duress. The answer of the defendants denied the right to the recovery of the bonds, and upon the trial the plaintiff moved that a verdict be directed for it upon the ground that the contract of June 13th had been broken on the 13th of August, and that Cornelius K. Garrison had no rights under it remaining to him, and, accordingly, he never acquired any ownership of the bonds in suit, and the title to them was now in the plaintiff, and that the alleged contract of August 13th was obtained by duress of plaintiff's goods, and accordingly void. And upon the further ground that the alleged contract of August 13th was not executed by the plaintiff nor by its authority, nor was it ratified by the plaintiff after execution, and accordingly did not bind the plaintiff. The plaintiff then requested the court to charge the jury as follows: (1) That if they find that nothing was done by C. K. Garrison prior to August 13th, in performance of the contract of June 13th, and that he then compelled the plaintiff's president to surrender the 100 bonds sued for, and to sign the alleged contract of August 13th, as a condition of returning to the plaintiff the rest of the bonds, they must find a verdict for the plaintiff. (2) That if they find that the agreement of August 13th was executed without the authority of the plaintiff, they must find a verdict for the plaintiff. (3) That there are no facts in this case operating as an estoppel against the plaintiff to prevent it from reclaiming the bonds by reason of anything that happened after August 13th. The court refused so to charge, whereupon the plaintiff asked that each of the following questions be submitted to the jury, viz.: (1) Whether, prior to August 13, 1881, C. K. Garrison ever took any steps in performance or

towards performance of the contract of June 13, 1881. (2) Whether on August 13, 1881, C. K. Garrison refused to deliver the bonds of the plaintiff in his possession, except upon the condition of signing the paper of August 13, 1881, and the surrender of 100 bonds. (3) Whether the plaintiff, in fact, ever did anything in ratification of the contract of August 13, 1881. These requests were denied, and the counsel for the defendants then moving the court to direct a verdict for the defendants, his motion was granted, and the complaint was dismissed, and from the judgment thereupon entered this appeal is taken. It is claimed by the defendants (1) that the cancellation agreement of August 13, 1881, was a valid agreement based upon a sufficient consideration, viz., the mutual cancellation and rescission of the agreement of June 13, 1881; (2) that the agreement was fully executed; the plaintiff got the 2,900 bonds and a full release from all its obligations and liabilities under the contract of June 13th; (3) that the agreement was that of the plaintiff executed upon sufficient authority; (4) conceding that the agreement was compelled by duress of goods, such duress made it voidable, not void, and it was the duty of the plaintiff to rescind promptly after it became *sui juris;* (5) it did not rescind promptly, but acquiesced in and affirmed it for over six years, until Garrison and all his witnesses were dead, and should be held to have ratified it for that reason; (6) the plaintiff asserts that it was induced to acquiesce by the efforts of Garrison and his son to form a syndicate to float the plaintiff's enterprise. That constitutes no legal excuse for its failure to promptly rescind. Besides, having received such consideration for its acquiescence and ratification, it cannot now be heard to repudiate it. It would seem that the main question involved upon this appeal is whether there is any evidence that the contract of August 13th, entered into between Cornelius K. Garrison and Mr. Hogg, the president of the plaintiff, was obtained by duress; and, if so, whether the plaintiff is in a position to maintain this action for the recovery of the bonds mentioned in the contract in question.

It is claimed upon the part of the plaintiff that the evidence shows that under the contract of June 13, 1881, although by its terms Garrison was required to act with diligence, yet he had done nothing, up to August 13th, towards its fulfillment; that he had been repeatedly requested by the president of the plaintiff to take steps for the fulfilling of the contract, and that finally the president, not being able to ascertain that Garrison had done anything under the contract, had purchased the rails to be provided under the Garrison contract upon his own credit, and furnished them to the company, and that he had an interview on the 13th of August with Mr. W. R. Garrison, who represented Cornelius K. Garrison, in which he details a remarkable conversation. This conversation was to the effect that he told Garrison that he had called at the office the day before to notify him that the earnest application he had made to purchase the rails had been disregarded, and that he had purchased the rails himself, using his own credit, and providing the banker's credit to pay for them on the other side; that William R. Garrison replied: "Yes, I have been so advised by C. K. Garrison, and we are glad of it, and you have relieved us of a great burden." Mr. Hogg then said: "I am very glad of that, if I have relieved you of a great burden, because I would have relieved you long ago if you had been frank with me, and told me that you did not intend to order those rails." And he said: "Now, having done that, you have broken this contract." William R. Garrison replied, "Of course, we have;" and further said: "I intended to break it. I have never been in sympathy with what C. K. Garrison has done. I intended to break it." Mr. Hogg then said: "That is all very good. I cannot trace where you have done any business with it. Now, I want you to surrender to me the bonds you hold as a guaranty for the fulfillment of your portion of this contract." Mr. W. R. Garrison then said: "I will surrender you 2,900 of those bonds." Mr. Hogg asked: "Why not surrender the whole 3,000?" "Be-

cause," Mr. Garrison said, "I mean to keep 100 of those bonds. You know C. K. Garrison told you he was going to keep them, and I am going to keep them." Mr. Hogg asked, "On what grounds?" And he replied: "Because I have got them." Mr. Hogg said: "Don't you believe there is relief in courts?" And Garrison said: "We have built too many railroads, and we know the anxiety of railroads to get their securities; and I intend to hold those bonds, and you can sue. I don't intend to deliver the 2,900 to you unless you surrender the 100 bonds." Mr. Hogg then gave the further testimony that he told Garrison he would pledge his word of honor as president of the company that he would never cancel that contract as such; that he was perfectly willing to surrender them in his individual capacity, as he would to a highwayman, to save his life; that he was perfectly willing to let Garrison rob him of 100 of the bonds in order to get back the 2,900, but that he would not do it unless in his individual capacity; that he was going to reserve to the railroad company whatever rights they might have; that the contracts were made by the company, and he did not see proper to prejudice their interests; that after this conversation, and at this meeting, he signed the agreement of August 13th; that he went with W. R. Garrison to the safe-deposit vaults of the Park Bank, by whom he was introduced to the people in the vaults, Garrison saying: "This is Mr. Hogg, president of the Oregon Pacific Railroad Company, and the vaults that have been taken here in which these bonds were deposited were taken for this company, and I want to surrender the vaults to him, and make the proper entry of it." He then opened the safe and took out these 3,000 bonds. Mr. Hogg said that he again protested against his retaining 100 bonds, and he said: "Very well, I will lock the papers up. You have signed the paper there in your individual capacity, and I am going to get these bonds and keep them in my hands, and then you may get them as you please." Hogg further testified that he received at this time from Garrison 2,900 out of the 3,000 bonds. He appears then to have been shown a receipt of the 21st of July, 1881, where, over his own signature as president, he acknowledges the receipt from Garrison of 400 of these bonds, and then says he was mistaken in saying that he received 2,900 on August 13th.

Upon an examination of this contract of August 13th, this peculiar feature will be observed that according to his own theory when Hogg is canceling the contract he is acting individually, but when he is receiving the bonds he is acting for the plaintiff; and this theory is based upon the fact that he seems to have signed the contract individually, and not as president. The contract expresses the receipt of a consideration from the Oregon Pacific Railroad Company, the cancellation of the contract because of that consideration, and the receipt by the company of the 2,500 bonds, being the remainder of the 3,000 mentioned in the agreement of August 13th. Mr. Hogg in his testimony expressly states that he was not acting on behalf of the company, and that he refused to act upon behalf of the company, and yet he received the 2,900 bonds on behalf of the company. He testifies that he told Garrison so, and that Garrison said he did not care anything about the release of the company; that he wanted Hogg's individual release, etc. And yet we find, by the minutes of the executive committee of the plaintiff, that a meeting of such committee was held on the 13th of August, 1881, at which Hogg was present, and that a resolution was passed by which the president, Hogg, was authorized to negotiate with Garrison for the cancellation and abrogation of the contract existing between him and this company, with power to close the transaction on the terms proposed, in his discretion. Now, it is clear from this resolution that other negotiations had been had between Hogg and Garrison, in reference to the cancellation of this contract, and that Garrison had stated his terms; that Hogg had submitted the proposition to the executive committee, and that the committee, having power so to do, the board of directors not being in session, authorized the president to accept the proposition, and to cancel and abrogate

the contract existing between him and the company; and that in pursuance of the authority this conferred upon him as president, he closed the transaction with Garrison. And yet we find him claiming that he acted without authority from the corporation upon his own responsibility, and that he did not pretend to act for the corporation, and not one word explanatory of the passage of this resolution is given. It is impossible to come to any conclusion except that negotiations for the abrogation of this contract had taken place between the plaintiff and Garrison. Propositions had been exchanged, such propositions submitted to the executive committee, and the president authorized to accept the same, and abrogate the contract, and that this idea of individual action arose entirely because Hogg had learned that he had signed this paper of August 13th, without adding his name as president thereto. It must be borne in mind that every person connected with C. K. Garrison, who had personal knowledge of any of these transactions, was dead. Mr. Hogg was living. He was competent to testify as to the personal transactions between himself and Garrison, and his attorneys, both of whom were dead, and he had no fear of contradiction; and that his recollection is not of the best is evident from the fact that he did not recollect his own receipt signed on the 21st of July for 400 of the bonds, and that he testified first that he received the 2,900 bonds back on the 13th of August. Under such circumstances, can it possibly be claimed that Hogg was acting individually and not upon the part of the corporation, when he had express authority to carry out this contract by the resolution of the executive committee having power to pass such a resolution? There is another fact proven by this resolution, and that is that claims were made by Garrison because of this contract, and that it was not deemed by the plaintiff that the contract was ended,—broken,—and that no liability could possibly arise thereunder, because by the resolution the contract is spoken of as one which was existing between Mr. Garrison and the company. They desired to get rid of it, and to be relieved from their obligations thereunder, and the results of these negotiations seem to have been the entry into the arrangement evidenced by the agreement of the 13th of August. But it is said that Garrison had no claim, and that he had done nothing under his contract, and that, therefore, the contract had been broken by him, and that there was no responsibility upon the part of the plaintiff to him. Whether the position of the plaintiff in this respect is well taken or not, it is not necessary to consider. It might be that in a legal proceeding upon this contract, Garrison would have no claims under the facts as now developed. But that it was at this time claimed by him to be a subsisting contract, and that the company recognized its existence, is, as already said, evidenced by the resolution of the executive committee, and it was for the purpose of settling this controversy that the agreement of August 13th was entered into.

It is well settled that it is not necessary, in order to uphold a promise based upon the surrender and compromise of a claim, to show that it is a valid claim or one that could be enforced at law. A promise made upon the settlement of disputes and to prevent litigation is made upon a good consideration. The settlement of a doubtful claim will uphold a promise to pay a stipulated sum, or do any other lawful act. *White* v. *Hoyt*, 73 N. Y. 505. And Mr. Chitty, in his work on Contracts, (volume 4, p. 45,) says: "And there can be no doubt that the resignation of a colorable claim, conflicting with that of another person, and the settlement of the dispute between the parties without suit, constitutes a good consideration." It therefore appears by documentary evidence, and which must control in view of the nature of the evidence given by Mr. Hogg on behalf of the plaintiff, and his evident want of memory as to the transaction to which he was testifying, that this agreement of August 13, 1881, was entered into as a settlement between Garrison and the plaintiff, of the claims which had arisen out of the contract entered into on the 13th of June, 1881, and it is too late for us to try, or attempt to try, the contro-

versy which was then disposed of, all the witnesses for the defendant being dead. But even if this were not the case the subsequent conduct of the plaintiff, by its long acquiescence in this agreement, and by the payment of the coupons upon the bonds held by Garrison for years after the plaintiff had been relieved from its alleged duress, is fatal to the present claim; because, where it is sought to rescind a contract obtained by duress, the same must be done promptly as soon as the party seeking relief has been relieved from the duress. *Bruce* v. *Davenport*, 42 *N. Y. 472; *Gould* v. *Bank*, 86 N. Y. 82; *Baird* v. *Mayor, etc.*, 96 N. Y. 567. "Where a contract is sought to be vacated as procured under duress, the party wronged must proceed promptly. If he remains still and recognizes the contract by making payments thereunder, he must be held to have waived the duress." 6 Amer. & Eng. Enc. Law, 88, tit. "Duress."

Now, it appears that from the 1st of October, 1881, to the 3d of October, 1887, inclusive, the plaintiffs paid regularly the interest coupons upon these bonds. This long acquiescence is attempted to be excused by evidence from Mr. Hogg, who testified that prior to the 1st October, 1881, he called upon Mr. William R. Garrison, and told him that the coupon interest on the 1st of October was maturing, and that he did not intend to pay the same; that they had some further conversation in which Mr. Garrison repeated the statement that they had not done anything to earn these bonds, (being seemingly particularly careful, according to Mr. Hogg's testimony, to decry his own title thereto, on every occasion when he saw Mr. Hogg,) and promised that, if the coupons should be paid, they would form a syndicate and take a large portion, if not the whole, of the bonds, provided they could earn their proper compensation out of it, and carn these bonds and this interest, and that in consideration of his attempting to do that, Mr. Hogg paid the coupons, and continued . to do so up to the time of his death, while he was trying—and he did try, as Mr. Hogg says—to form a syndicate, and that Mr. Ward, after W. R. Garrison's death, continued his efforts. But although Ward died in August, 1884, and all attempts to form a syndicate then ceased, in any event the coupons seem to have been paid up to October 3, 1887, three years thereafter. °If these coupons were paid upon the agreement of Garrison that he would form a syndicate for the disposal of plaintiff's bonds, then a new contract was entered into confirming the old; and if this new contract was not fulfilled, the only remedy of the plaintiff rested upon the new contract, because after the old contract had been deliberately confirmed, it could no longer be rescinded for duress. This acquiescence, subsequent to the alleged breach of the contract to form a syndicate, is entirely unexplained, is entirely inconsistent with the theory that Garrison procured these bonds by duress, and should be held now, in view of the fact that all the parties who represented the interest of Mr. Garrison, and had personal knowledge of these transactions, are dead, and cannot contradict the statements made by Mr. Hogg upon the stand, to preclude the plaintiff from now attempting to rescind the contract under which the bonds in question were received. The plaintiff could not wait for the purpose of seeing how the new agreement was going to turn out, but was bound to act at once.

Another objection is made to the plaintiffs' recovery, and that is that there has been no offer to return the 2,500 bonds received at the time of the execution of the contract of August 13th. A party seeking to rescind a contract must not only act promptly on discovering the ground of rescission, but must restore or offer to restore whatever he has received under the contract. *Schiffer* v. *Dietz*, 83 N. Y. 300; *Gould* v. *Bank, supra.* He may not wait for the purpose of seeing how the contract is going to turn out, and determine whether he may not receive a benefit from it, but he must at once act upon the discovery of the facts authorizing the rescission, and return all that he has received thereunder. These principles are undoubtedly correctly stated. But the rule does not apply where, if the contract sought to be rescinded had

never been made, the plaintiff would have been entitled to receive the payments made under the contract. In such a case, no offer to return is necessary; nor is it proper for the court to order restitution. This was distinctly held in the case of *Allerton* v. *Allerton*, 50 N. Y. 670. In that case the complaint alleged that plaintiffs, defendant, and one McPherson were partners in conducting certain stock-yards at Pittsburgh, Pa.; that plaintiffs, induced by the fraudulent representations of the defendant, who had the management of the business, that the business was not profitable, and that he in conjunction with them would sell out to McPherson, consented to unite with him in such sale, upon being refunded the amount invested by them, and that thereafter defendant represented that he had sold out and paid to plaintiffs the moneys advanced by them; that in fact the defendant did not sell, but retained his interest, and afterwards acquired McPherson's interest; that the business was profitable, and defendant had received large gains and profits; and the plaintiffs asked that the sale be declared void, that defendant account for all moneys received by him, and that they have judgment for their portion of the profits under the agreement, less the amount they had received. The case was tried by the court, who found the fraud as alleged, and decided that the plaintiffs were entitled to the share of the profits to which they were originally entitled, less the amount received by them on the sale, and that defendant execute a retransfer to plaintiffs of the interest they had prior to the sale. Judgment was entered upon the decision, which was reversed by the general term, upon the ground that no fraud was shown, and that McPherson or his representatives should have been joined as defendants, and that the plaintiffs should have tendered back the sums received by them on the sale. The court of appeals reversed the general term, and affirmed the special term, holding that the fraud was established, and that no tender of the amount was necessary before suit brought, as the judgment allowed it to defendant, and this was, in fact, an actual return of the consideration paid, and that the question of the misjoinder or non-joinder of parties not having been raised by the pleadings or upon the trial could not be raised upon appeal. It seems to have been held in this case, therefore, that if the plaintiff is entitled to receive the money, whether the contract was rescinded or not, no tender or offer to return is necessary, and it is only where the plaintiff's claim to the payment actually made rests upon the contract sought to be rescinded, and, therefore, its retention is not compatible with the rescission of that contract, that an offer to return is deemed necessary. In the case at bar the question as to the necessity of the return of the bonds upon rescission arises only upon the assumption of the truth of Mr. Hogg's testimony. This testimony, if true, would show that it was conceded even by Garrison that he had no claim whatever upon the bonds, and that the claim he made was without the shadow of foundation; and hence even if the contract of August 13th was rescinded, he could not possibly have any right to the bonds returned by him to the company. This being the situation of the parties, if a right to rescind existed, no offer to return seems to have been necessary. This testimony of Mr. Hogg, however, as has already been said, in view of the documentary evidence clearly contradicting him, and the remarkable features of the evidence itself, is entirely unreliable. We are of the opinion, therefore, that the judgment appealed from should be affirmed, with costs.

BARTLETT, J., concurs.

BARRETT, J. I concur with the presiding justice, and desire to add some additional considerations to those which he has so clearly stated. It seems to me that the plaintiff proceeds upon an extreme view of the facts. Upon the evidence, it is by no means, as contended throughout, substantially a case of property obtained, so to speak, by a highwayman, and restored in part upon.

an agreement to permit the retention of the remainder. The bonds were lawfully in Mr. Garrison's possession, and he had a contract which if executed would have entitled him to precisely what he demanded, namely, these 100 bonds. The plaintiff says that he had entirely neglected to proceed with the performance of that contract, and had consequently forfeited his right to these bonds. But the contract had not actually been canceled when the plaintiff's president, without notifying Mr. Garrison, made other arrangements, and himself effected the purchase for the company of the very rails called for by Garrison's contract. Upon being told of this, Mr. Garrison said he was glad, but insisted upon retaining the bonds which would have been his in case the contract had gone on and been executed. That in legal effect was a denial of forfeiture; an assertion that the contract was a valid, existing one, and that he (Garrison) would assent to its abrogation only upon receipt of the entire profits derivable therefrom. It is quite true that this claim was probably a slim one; that Garrison had been guilty of negligence; and it is not unlikely that the company could have abrogated the contract, and recovered back all the bonds which he then held as security, including these in question. Still that cannot be treated as absolutely certain. There is evidence here tending to show such negligence, and even that it was intentional. But there is also evidence that the contract had not been canceled, that the company recognized its existence by authorizing its chief officer to negotiate for cancellation, and that before such negotiations were completed, consequently before cancellation, the company had been placed in a false position by its president's purchases elsewhere. Here certainly was ground for a contest. The company's position was a delicate one. The contract was alive and uncanceled. It had never notified Mr. Garrison that it would wait no longer. The execution of the contract had become entirely undesirable owing to the new arrangements which had been made by its president. Under these circumstances, while Garrison's attitude was a hard and probably unconscionable one, it is absurd to liken his claim, to the full profits of the contract, to that of a highwayman demanding one's money or life. And it is therefore idle to rest the case upon legal analogies proceeding from this extreme view. A contract obtained by the highwayman is of course void from the beginning to the end. A payment on account of such a contract would be a gratuity and not a ratification. Indeed, it would be ridiculous to talk of ratifying robbery. In the case at bar, however, there was certainly color for a contest; and, while Garrison's position, as testified to by Mr. Hogg, may have amounted in a legal sense to what is called "duress," there can be no doubt that the antecedent facts called for prompt rescission the moment the company was freed from such duress. I do not mean that it was bound to go into a court of equity, but it certainly was bound to disaffirm. Here, however, there was active, deliberate, and continuous ratification. It had a right to so elect, and it is bound by the election. It thus said, in effect, we have been deprived of these bonds unjustly; but upon the whole, we are the gainers by leaving the matter as it is. If we proceed for the bonds, Garrison may insist upon all his rights under the original contract, and although his conduct thereunder has been such that we think he is entitled to none of its benefits, yet we would rather let him keep the bonds, than be subjected to a shadow of risk on that head. On that, they rest for over six years, paying Garrison, his assignee, and his executors, with unfailing regularity, the running interest coupons; and now, when every one concerned is dead, come into court with a claim of robbery, pure and simple. It seems clear to me that such a claim is wholly without merit. The force of this ratification is sought to be broken by Mr. Hogg's statement that the coupons were paid because Garrison promised to make a syndicate that would take a large part of the company's bonds. What is that, however, but ratification founded upon a new promise,—an overlooking of the alleged duress in expectation of future help. It is said that the new consideration

failed, but the proof is that Mr. Garrison tried to effect the syndicate, and there is no pretense of deceit or bad faith in that regard. And, further, it appears that these payments continued long after all hope of assistance in that direction had vanished, indeed, long after Mr. Garrison's death. The verdict was properly directed, and the judgment should be affirmed.