### FOERSTER *v.* SQUIER.

*(City Court of New York, General Term.* June 18, 1892.)

DURESS—THREATS TO FILE MECHANIC'S LIEN—RATIFICATION.

An indorser of a note in an action thereon by the payee testified that the indorsement was coerced by threats of the payee to file a mechanic's lien on buildings that were being erected for him by the maker of the note, to reach money due or to become due the maker. Similar threats had been made two months before the note was indorsed, giving the indorser time within which to investigate the payee's rights. Three months after the note was made, when it fell due, and was dishonored and protested, no objection was made that it was indorsed under threats, and 12 days after its maturity the indorser made a payment on it. *Held* that, if the indorsement were made under duress, and void, it was subsequently acquiesced in and ratified.

Appeal from trial term.

Action by Emanuel Foerster against Albert C. Squier. From a judgment entered on a verdict directed by the court in favor of plaintiff, defendant appeals. Affirmed.

Argued before McGOWN, VAN WYCK, and FITZSIMONS, JJ.

*Alex. Thain,* for appellant. *Briesen & Knauth,* for respondent.

VAN WYCK, J. This action is to recover on a note made by one Osborne to the order of the plaintiff, and indorsed by defendant. This is an irregular indorsement, and defendant could not be held liable by the plaintiff, payee, as held in *Reed* v. *Photo-Gravure Co.,* (City Ct. N. Y.) 13 N. Y. Supp. 798, unless parol proof was given that such indorsement was made to give the maker credit with the payee. However, it is alleged and proved that such indorsement was so made in the case at bar. The defendant denied indorsement for value or as guarantor; delivery to plaintiff either by him or the maker; presentment for and refusal of payment; protest and notice thereof, and alleged indorsement for accommodation of plaintiff; delivery by maker without consideration; extension of time of payment to maker without defendant's knowledge; payment in full by the maker; and that he had been coerced into making the indorsement by duress, in that plaintiff had threat-

ened to file a mechanic's lien against his houses which were in process of construction, although he had no legal right to do so, unless defendant would so indorse the note made by Osborne, who was under contract with defendant to build the houses or some part thereof. After both parties had finally rested, the court announced, "I propose to direct a verdict;" and defendant's counsel then asked to go to the jury upon the defense of duress, which was denied and excepted to, and thereupon the court directed a verdict for plaintiff for amount claimed, which was immediately rendered by the jury. The defendant, having requested to go to the jury only on the defense of duress, must be deemed to have either conceded that there were no disputed questions of fact as to his other defenses, or consented that the court might become the trior of the disputed questions of fact as to those defenses. Hence the most favorable position which can be accorded to defendant on this appeal is to review the findings of the court below upon the questions of fact, as to his defenses other than that of duress, as against the weight of evidence, and as against the law, and to determine whether the court was justified in ruling, as matter of law, that defendant's proof of his defense of duress, admitting its truth, was insufficient to maintain that defense. The findings of the court of the facts as to the defenses other than duress, by directing a verdict against the defendant, are not against the weight of evidence, and are amply justified by the evidence. Hence is reached the consideration of the question whether the court was justified in ruling, as matter of law, that the defendant had failed to make out his defense of duress, and, in considering the same, it must be assumed that all of his evidence relating strictly to that defense is true, and he must be accorded the most favorable inferences therefrom. The following is, *verbatim*, the testimony of the defendant, the only witness for the defense: Albert R. Squier, being duly sworn, testified as follows: "I am the defendant in this action. I know Mr. Foerster. I never promised to pay Mr. Foerster any money. I never owed him any money. I never said, in the presence or hearing of Mr. Foerster, that I owed Mr. Osborne any money. I have heard Mr. Foerster's statement in regard to an interview that was about two months before the making of this note; that he saw me and threatened to stop the work, and that I said to wait a couple of weeks or so, and left it to be inferred that I said I would pay him if he would do so. I made no such promise. I did not promise to pay him any money,— did not owe him anything. Mr. Foerster has testified that, at an interview had with me about two months before the making of this note, he threatened to stop the work unless he had some money, or something of that kind, and that I asked him to wait a couple of weeks, and said or intimated that I would pay him, or see that he was paid, if he would go on with the work. *Question.* Did that take place? *Answer.* Not those words; no, sir. *Q.* How do you modify it, or what was the fact in respect to the interview? *A.* It was Squier & Whipple's buildings. I am a member of that firm. Mr. Osborne was there. There was no money due Mr. Osborne, and Squier & Whipple refused to give any note, because there was nothing due. Foerster threatened to put a lien on. I said that, if he would allow the work to go on, there would be money coming to Mr. Osborne, probably, and it would be fixed if there was; that there would be money coming to him; that there was not then. This was at an interview two months before the note. I recollect the interview over in Eightieth street, or in some street over in that neighborhood. Mr. Osborne, Mr. Foerster, and Mr. Middlebrook were present. *Q.* Is your recollection of that interview substantially the same as Mr. Foerster's? *A.* Well, nothing material to alter it, because we refused to give a note to Mr. Osborne, as there was nothing due. There was something said about coming down town. The day that this note was indorsed I was in my office. Mr. Osborne, Mr. Foerster, and Mr. Middlebrook were present. *Q.* Now, tell us what took place, and how you came to indorse this note, and what was said by Mr.

Foerster. *A.* I said at that time our firm did not owe Mr. Osborne anything. That was the beginning of the conversation. Mr. Foerster threatened to put a lien on the buildings, if he did not get money from somebody. That I recollect, and then there was considerable talk to see if he would wait until money was coming to Mr. Osborne. He said he could not. He needed something to put in his bank,—something to carry himself along,—and, after considerable talk, the note was indorsed by Mr. Foerster's request. That he wanted to put it in his bank, and that Mr. Osborne would take care of it, as Mr. Osborne said so. *Cross-Examination.* The buildings that I have been talking of are four-story buildings principally; some three-story; one, the west side of Eighty-Sixth street, Eighty-Fourth street, and West End avenue. About the time of this transaction I was erecting those buildings. I was one of the partners,—a partner of the firm of Squier & Whipple. I was interested in the work that was proceeding about the buildings. I did not know as plaintiff had ever been doing any work on them. I did not know that he had anything to do with the buildings. I simply knew he threatened to do something. He had nothing to do with those buildings. I did not know anything at the time he had. He threatened to put a lien on. I heard he had furnished diamonds to Mr. Osborne to put in saws to saw stone. I don't know as he furnished anything for those buildings. I never knew it. It was not my impression that he was a total stranger at the time, coming and saying to me that he wanted to put a mechanic's lien on the buildings. I knew he had something to do with Mr. Osborne. He did not pretend I owed him anything. I did not know that the something he had to do with Mr. Osborne related to those particular buildings. I understood that he was doing work for Mr. Osborne. I swear that at the time of that interview at my office with the plaintiff, I, nor my firm, did not owe any money to Mr. Osborne. I was induced altogether by the threat that Mr. Foerster would put a mechanic's lien on the buildings to make this indorsement. That was the sole inducement. I was afraid he might carry out that threat. I thought he would. He acted as though he would. If it had not been for this fear, I would not have made the indorsement on that note. The reason that I expected that there would be money coming due to Mr. Osborne was that, according to his contract, as he got up to a payment, we always gave him notes of Squier & Whipple, or cash,—one or the other. Never A. C. Squier. Well, sometimes it would be done; but, as a usual thing, the notes were given by Squier & Whipple when there was anything due. Mr. Osborne was contractor or agent in erecting these buildings for Squier & Whipple. Under that contract I expected that payments would be due to him from my firm. That was the situation at the time when this indorsement was made. Afterwards he continued this work about the building, but he never finished. They have never been finished by Mr. Osborne. The work went on after this transaction took place. Osborne continued to erect the buildings. Whether the plaintiff furnished diamonds after that I don't know. I believe Osborne got some diamonds somewhere else. At the interview in Eightieth street something was said about going down town to my office. Foerster talked very much. He said he would stop all the work,—put liens on, and such things. I said I would go round and see if something could be done to keep him from putting a lien on. That was the principal thing. Mr. Foerster said he must have some money or paper or something or other. He made a claim against Osborne for the money due to him. I don't remember just how much. He said, of course, Osborne owed him. He did not say we did."

It must be remembered that, as defendant requested to go to the jury only upon his defense of duress, the court below has, as the judge had, the right to, under the circumstances and as the evidence justifies, hold that defendant before delivery to the plaintiff, payee, indorsed the note for the purpose of giving the maker credit with the payee, that the same was duly pre-

sented, protested, and notice thereof duly given, and every other fact necessary to maintain plaintiff's cause of action, and disprove all of defendant's alleged defenses, except that of duress. Does defendant's proof make out his defense of indorsement under duress? It is not contended that it shows coercion by law or duress of person. Does it show duress of property by coercion in fact? The appellant contends that it does, and cites only two cases to sustain his contention. One (the case of *Adams* v. *Bank*, 116 N. Y. 606, 23 N. E. Rep. 7) was an action by a wife to recover back money paid to the bank, a creditor of her husband, under a threat to arrest him on board of the steamer upon which he and she were to sail for Europe; and the judge writing correctly states the rule to be that, in relation to husband and wife or parent and child, each may avoid a contract induced and obtained by threats of imprisonment of the other, and it is of no consequence whether the threat is of a lawful or unlawful imprisonment. The other (*Gates* v. *Dundon,* City Ct. N. Y., 18 N. Y. Supp. 149) was upon a note obtained from defendant upon false and fraudulent representations, and proof of their false and fraudulent character was admitted to be in the handwriting of plaintiff's bookkeeper, and the general term refused to disturb a verdict rendered for defendant. In the case at bar there is no allegation or proof that plaintiff made any false or fraudulent representations, but simply that he threatened to file a mechanic's lien against defendant's property to reach money which might be or become due the maker of the note, who was the contractor for defendant in building the houses. How is it possible that defendant, an extensive builder of houses and an experienced business man, could have been coerced into indorsing the note by reason of plaintiff's threat to file a mechanic's lien? for he must have known of his legal right of defense to all such proceedings, when begun without good cause. Can it be possible that a simple threat to begin an action is such coercion in fact as to make out a defense of duress of property in a case wherein no fraud or false representations are alleged? In all the leading authorities on duress of property, the conditions seem to have been that the owner has been coerced into payment or promise to pay in order to regain possession of his property which had been unlawfully taken or detained; and, moreover, in nearly every one of these cases there was no consideration for the payment or promise, except such as might be implied from the surrender of the identical property, and this only upon the theory of a dispute and doubt as to whether the taking or detention was lawful or unlawful. But in this case the court has held, and rightly held, as matter of fact, that the defendant's indorsement was made to give the maker credit with the plaintiff, and that it had accomplished its purpose, and hence was made for valuable consideration. The defendant himself says that, two months before the making and indorsement of the note, plaintiff refused to further supply goods to the maker, unless he was paid or secured, and then said he would file a mechanic's lien, and that he repeated this threat at a second interview, and reiterated it at the time when the note was indorsed and delivered to him. It does seem that defendant had plenty of time during those two months to inform himself as to his legal rights in the matter, and as to whether plaintiff had lawful right to file a mechanic's lien or not. Moreover, this note was made, and indorsed by defendant, and delivered to plaintiff on May 10, 1890, and had three months to run, falling due and being protested on August 13th, and notice thereof given to defendant on the next day; yet no objection or complaint is heard from him, and on August 25th, 12 days after nonpayment and protest, the defendant pays by his own check, drawn to the order of the plaintiff, $250 on account of this dishonored and protested note, although he contends that his indorsement had been coerced from him by a threat to file a mechanic's lien against his property first made five months previous, and reiterated more than three months before the voluntary payment by him on account thereof. Parsons.

in his work on Contracts, says, on page 395, "that a contract made under duress is not, however, strictly speaking, void, but only voidable; because it may be ratified and affirmed by the party upon whom the duress was practiced." Chief Judge VAN BRUNT quotes section 21, title "Duress," of 6 Amer. & Eng. Enc. Law, p. 88, with approval, in *Railroad Co.* v. *Forrest,* (Sup.) 11 N. Y. Supp. 8, as follows: "Where a contract is sought to be vacated as procured under duress, the party wronged must proceed promptly. If he remains still, and recognizes the contract by making payments thereunder, he must be held to have waived the duress." One of the main grounds for holding that the duress had been waived in that case was that the railway company had continued to pay the semiannual coupons on the $100,000 of bonds which it claimed had been obtained from it while under duress; and this case was affirmed in 128 N. Y. 83, 28 N. E. Rep. 137. The payment of $250 on account of the note by the defendant in this action would seem to be stronger evidence of his ratification and recognition of the validity of the note than the payment by the railway company of the semiannual coupons upon the bonds obtained from it while under duress was evidence of its ratification and recognition of the validity of the transaction under which the bonds were so obtained, for the railway company offered, as an explanation for the payment of these coupons on the $100,000 bonds so obtained, that to default in the payment of these coupons might taint the very validity of the other $2,900,000 bonds of the same issue, would impair their credit and ready sale, and might absolutely prevent their sale, which was necessary in order to construct and equip the railroad. But this defendant did not deny the payment on account of the note after its dishonor and protest, and offers no explanation whatever for making such payment, and hence is left standing the legal presumption, which arises from an unexplained voluntary payment on account of a voidable contract, that the same has been ratified and recognized as valid. The judgment and order appealed from are affirmed, with costs.

All concur.