[L. A. No. 4248. In Bank.—July 3, 1918.]

# J. D. THOMAS, Appellant, v. A. OTIS BIRCH et al., Respondents.

OPTION CONTRACT—PURCHASE OF CORPORATION STOCK—WANT OF CONSIDERATION FOR OPTION.—An agreement whereby plaintiff gave defendant an option for a limited time to purchase certain corporation stock at a stated price, without any consideration from defendant to plaintiff for the privilege, and without any agreement on the part of the defendant to buy or pay, was not binding upon either party until the defendant exercised the option by making the payment within the time limited, although the stock was deposited in escrow.

ID.—RIGHT OF REVOCATION.—An agreement for an option, not based upon a consideration, is simply a continuing offer, which may be revoked at any time.

ID.—ESCROW—RIGHTS OF PARTIES.—The rights of the parties to an agreement granting an option to purchase, pending payment or notification of acceptance on the part of the party to whom the

option is offered, are not affected by the fact that the subject of the purchase is placed in escrow.

ID.—BINDING CONTRACT NECESSARY TO SUPPORT ESCROW.—There must be a binding contract to support an escrow.

ID.—RIGHT TO RECALL SUBJECT OF ESCROW FROM DEPOSITARY.—One who deposits the subject of an option or offer of sale in escrow may recall it as long as he has the right to revoke his offer of sale.

ID.—FRAUD IN PROCURING OPTION—REVOCATION BY DEFRAUDED PARTY —TIME TO EXERCISE RIGHT.—A party who has been induced by fraud to give an option, terminable at his pleasure, must, if he discovers the true state of facts before the option has by acceptance or payment ripened into a binding contract, exercise his right of revocation, or else be deemed to have waived it.

ID.—ACTION FOR DAMAGES FOR FRAUD — PLEADING — COMPLAINT—DE-MURRER.—Where, in an action for damages for fraud it is alleged in the complaint that the defendant, by fraudulently concealing from the plaintiff the true value of a certain oil well, which was the property of a corporation, and by concealing facts as to the development of such well, and by fraudulent representations as to the condition and value of the property of the corporation, induced the plaintiff to give the defendant an option to purchase the plaintiff's shares of stock in the corporation at a price less than their value, and to deposit the stock certificates in escrow to be delivered on payment of the purchase price, and that the defendant thereafter made payment for and took the stock at the option price, but it also appeared from the allegations in the complaint that several days before the defendant paid for and took the stock the plaintiff learned all about the well and its value, and its effect upon the value of the shares, when it was still within the plaintiff's power to revoke the option and retain his stock, a demurrer to the complaint was properly sustained.

APPEAL from a judgment of the Superior Court of Orange County. W. H. Thomas, Judge.

The facts are stated in the opinion of the court.

Clyde Bishop, H. C. Head, Williams & Rutan, and Trippet, Chapman & Biby, for Appellant.

George H. Woodruff, Clyde C. Shoemaker, and Hunsaker & Britt, for Respondents.

SLOSS, J.—A demurrer to the second amended complaint having been sustained, and the plaintiff declining to amend

further, judgment was entered in favor of the defendants. The plaintiff appeals.

The complaint in question alleges that during 1910 and 1911 the plaintiff was the owner of 650 shares of the capital stock of Menges Oil Company, a corporation having an outstanding capital stock of ninety thousand shares. The defendant Birch was a director of said corporation, and its president and general manager. As such officer, he employed the defendant Good as superintendent, and Birch and Good were in actual charge and control of the operation of the company's property. The Menges Oil Company was the owner of twenty acres of land in Orange County, and was engaged in producing oil and gas and in developing new wells thereon. On February 7, 1911, the corporation had partially developed said land by drilling four wells, which were then producing about four hundred barrels of oil per day. The land, with the machinery and equipment belonging to the corporation, and the oil and gas produced by the four wells, made the outstanding stock worth not less than two dollars per share. For some months prior to February 7, 1911, the corporation had been engaged in drilling an additional well, designated as well No. 5. During these months all of the profits derived from the four producing wells, amounting to about seventy-five thousand dollars, were expended in drilling well No. 5. On or about said seventh day of February, 1911, well No. 5 had been drilled to a depth of about four thousand feet, and was actually finished and completed, but was not open for production, "though it had been actually bored into and had reached a very rich and productive oil sand, capable of producing oil to the average amount of two thousand six hundred barrels of oil per day, for many years thereafter, of the average value of one dollar and twenty-five cents per barrel, and also large quantities of gas of the value of at least five hundred dollars per day; but that plaintiff did not then know of said completion and great value of said well No. 5." The defendants Birch and Good had personal control of well No. 5, and had actual knowledge of the facts regarding the well and its value. Birch, together with members of his family, owned a majority of the stock of the corporation, and thereby exercised actual control thereof. The defendants, knowing the value of the property of the corporation, and of well No. 5, conspired together to mislead and defraud the minority

stockholders, including the plaintiff, and induce them to sell their stock to Birch for an inadequate consideration. For this purpose they instructed the other employees of the corporation to give to the stockholders no information regarding the condition of the property, and particularly of well No. 5. At meetings of the stockholders and directors of the corporation held shortly prior to February 7, 1911, Birch, for the purpose of inducing the plaintiff and other stockholders to sell their stock, stated that it would be necessary to levy large assessments upon the stock of the corporation in order to enable it to continue its development work. At the time of such statements the debts and expenses caused by the drilling of well No. 5, and placing it in a condition to produce oil and gas, had been paid out of the funds of the corporation. In order further to conceal the true value of well No. 5, and prevent the plaintiff and other minority stockholders from ascertaining its true productive value, the defendants represented that such value was very uncertain and problematical, and that the said well would probably be of very little value, thereby causing the plaintiff and other minority stockholders to believe that their stock was worth no more than two dollars per share. The defendant Birch further represented to plaintiff and other minority stockholders that if they would sell their stock at two dollars per share, they would receive its reasonable value, and would avoid the necessity of paying assessments, and thereby said Birch would be enabled to induce an oil operator of large means to purchase the stock, and furnish the corporation with sufficient capital to develop its property. All of said statements were false and fraudulent, as defendants well knew, and were made with the purpose of inducing the plaintiff and other minority stockholders to sell their stock at two dollars per share. Plaintiff and such other minority stockholders believed said statements, and were thereby misled and defrauded. In order to inform himself as to the condition of the property, the plaintiff, about and just prior to February 7, 1911, made inquiries of one Porter, the secretary of the corporation, regarding the condition of the property, including well No. 5, and was informed by Porter that the value and productiveness of said well No. 5 were very uncertain and problematical, and that the value of plaintiff's stock was two dollars per share, all of which statements plaintiff believed and acted upon in the sale of his

stock. The statements so made by Porter "were made from information and statements given to him by the said defendants" for the purpose of having them given to the plaintiff, and Porter made the statements to the plaintiff in good faith. The defendants instructed the drillers and other employees of the corporation not to give the plaintiff or other minority stockholders any information relative to the condition of the property, and they did not give any such information. By said action the plaintiff and other minority stockholders could not gain any information as to the true condition and value of well No. 5 at the time plaintiff sold his stock, and for many months thereafter.

The pleading goes on to allege that plaintiff had long been associated with the defendant Birch, and had faith in his integrity, and, believing his statements, agreed, on February 7, 1911, to sell his 650 shares to Birch, or others represented by him, for two dollars per share, "said sale being conditioned upon the payment of one-fourth of said amount, on or before the eighteenth day of April, 1911, and giving a note for the balance of said purchase price. . . . the said note and stock to be held in escrow until final payment was made," and if payments were not made, the stock to be returned to plaintiff. The shares were then, in fact, worth fifty dollars each by reason of the boring and development of well No. 5. On or about April 18, 1911, Birch, in accordance with the agreement for the sale of the stock, made payment therefor, and took the stock, which had been deposited in escrow. Plaintiff could not, at said time, i. e., on or about February 7, 1911, ascertain the facts as to the true condition of well No. 5 because until the well was opened for production no one but those engaged in the drilling could know whether the well had been drilled into productive oil sands. The defendant Birch obtained an agreement for the purchase of the last outstanding minority stock of the corporation about March 13, 1911, and immediately thereafter, i. e., on or about March 20, 1911, the defendants opened well No. 5 for production, and permitted oil and gas to flow therefrom, "but that said defendants did not permit the fact that said well had been opened for production to become known until some time thereafter, and that this plaintiff did not learn of said fact until on or about the tenth day of April, 1911, and that the great value of said well, and the greatly increased value of the

property of said corporation, did not become known to this plaintiff until after he had learned of the opening of said well No. 5 for production as aforesaid. That immediately upon the said opening of said well No. 5 for production it commenced to produce more than two thousand six hundred barrels of twenty-eight gravity oil per day, of the value of more than one dollar and twenty-five cents per barrel, and gas of the value of not less than five hundred dollars per day, and that ever since the said time said well has continued to produce oil and gas in said quantities and of said value.''

It is further alleged that the plaintiff had no knowledge or information of any of the fraudulent acts and concealments on the part of the defendants until April, 1913, when he was told thereof by Porter, and other minority stockholders. About the same time he was also informed by a man who had been in the employ of the corporation during the drilling of the well that at the time of the purchase from plaintiff the defendants knew that well No. 5 had been drilled into rich oil sand, and that the defendants were then preventing the well from producing oil and gas, and concealing its true condition. This, it is averred, was the first information procured by plaintiff as to the fraudulent acts and concealments on the part of the defendants.

After acquiring the stock of plaintiff and others, Birch and his associates caused the corporation to transfer all of its property to another corporation, the Birch Oil Company, owned and controlled by the defendants, and on or about August 19, 1911, caused the Menges Oil Company to be dissolved. Thereby it became impossible for the plaintiff to rescind the sale of his stock. The complaint sets up a further transfer of the property under the direction of Birch, for the purpose of impeding plaintiff in his efforts to recover his stock. The prayer of the complaint is for damages in the sum of thirty-one thousand two hundred dollars, based upon the difference between the purchase price and the alleged true value of fifty dollars per share.

The demurrer specifies a number of grounds, and the respondents argue earnestly in support of each. In our view, one ground of demurrer, at least, is well taken, and the others do not call for discussion.

We have given a rather full statement of the complaint for the purpose, primarily, of showing that the plaintiff's

charges of fraud, however frequently reiterated and variously phrased, all revolve around the central point of the condition, the productivity, and the value of well No. 5. The essence of plaintiff's claim is that he consented to sell his stock at two dollars per share because he was kept in ignorance of the fact that well No. 5 was capable of producing oil and gas in such volume as to make the stock of the company worth fifty dollars per share.

The "agreement" which, as the complaint alleges, the plaintiff was induced to make on February 7, 1911, did not, at that time, deprive him of any interest in the stock. It is alleged that plaintiff agreed to sell his shares to defendant at two dollars each, upon the condition of the payment, on or before April 18, 1911, of one-fourth of the purchase price, and the giving of a note for the balance, the note and the stock to be held in escrow. There was, so far as the complaint shows, no agreement by Birch to buy or to pay. He was merely given the privilege, for a limited time, of purchasing the stock at a given price. It is not alleged that he gave any consideration for this right. The transaction was, in other words, a mere grant, without consideration, of an option to buy the stock. So long as Birch did not exercise the option by making the payment within the time limited, he had assumed no obligation, and the so-called agreement was, therefore, not binding upon either party for want of mutuality. (13 C. J. 331.) "An agreement for an option not based upon consideration is simply a continuing offer which may be revoked at any time." (21 Am. & Eng. Ency. of Law, 929.) The rights of the parties (pending payment or notification of acceptance on the part of Birch) are not affected by the allegation that the stock was placed in escrow. There must be a binding contract to support an escrow (*Fitch* v. *Bunch*, 30 Cal. 208; *Miller* v. *Sears*, 91 Cal. 282, [27 Pac. 589]; *Holland* v. *McCarthy*, 173 Cal. 597, 602, [160 Pac. 1069]), and plaintiff could recall his stock from the depositary so long as he had the right to revoke his offer of sale. A binding contract arose, for the first time, when Birch, on April 18, 1911, made payment and took the stock. But the plaintiff's own pleading alleges that on April 10, 1911, eight days before payment of the purchase price, he learned that well No. 5 had been opened for production, and the further allegations, fairly construed, amount to an admission that he then learned

all about the well and its value, and the effect of its development upon the value of the shares. At that time it was still within his power to revoke the option and retain his stock. Instead of so doing, he allowed the defendant to go on and consummate the purchase, took the agreed price, and then, after a lapse of some three years, charges fraud in a transaction which he voluntarily carried into effect, after full knowledge of the facts. This he cannot do. Strong authority may be cited for the view that, even if there had been a contract of purchase and sale, binding upon both parties, the seller could not, where he discovered the fraud while the contract remained wholly executory, deliver the property and receive the purchase price, and still maintain an action for damages for the fraud. (*McDonough* v. *Williams*, 77 Ark. 261, [7 Ann. Cas. 276, 8 L. R. A. (N. S.) 452, 92 S. W. 783]; *Thompson* v. *Libby*, 36 Minn. 287, [31 N. W. 52]; *Baird* v. *Mayor of New York*, 96 N. Y. 567, 576.) In *Thompson* v. *Libby, supra,* the court said: "To allow a person who has discovered the fraud while the contract is still wholly executory to go on and execute it, and then sue for the fraud looks very much like permitting him to speculate upon the fraud of the other party. It is virtually to allow a man to recover for self-inflicted injuries." It is not necessary, for the purposes of the present case, to go so far. Whatever may be the rule where the parties have entered into a contract which upon its face binds both, it should certainly be held that a party who has been induced by fraud to give an option, terminable at his pleasure, must, if he discovers the true state of facts before the option has, by acceptance or payment, ripened into a binding contract, exercise his right of revocation, or else be deemed to have waived the fraud.

It follows that the complaint failed to state a cause of action, and on this ground, without regard to other points made by the respondents, the ruling of the court below must be upheld.

The judgment is affirmed.

Wilbur, J., Shaw, J., Richards, J., *pro tem.,* and Angellotti, C. J., concurred.