## DEFENBACHER et al. v. WALKER et al.
### No. 28901.

United States District Court
N. D. California, S. D.
May 2, 1950.

Joseph L. Alioto, Chauncey McKeever, San Francisco, Cal., and Dana C. Smith, Pasadena, Cal., for plaintiffs.

Herbert W. Clark, Morrison, Hohfeld, Foerster, Shuman & Clark, Philip A. Ray, and McCutchen, Thomas, Matthew, Griffiths & Greene, all of San Francisco, Cal., for defendants.

ROCHE, Chief Judge.

This is an action for fraud in which the plaintiffs seek damages, an accounting and other relief for the alleged violation of a fiduciary relationship by the defendant Kenneth R. Walker during the course of certain timber transactions. Defendants deny that Kenneth R. Walker was such a fiduciary and contend that, even if he were, plaintiffs waived the alleged fraud. For an

understanding of the problem a rather detailed review of the facts, as disclosed by the record, is necessary.

Plaintiffs, Minnesota citizens, and Kenneth R. Walker, a California citizen, are descendants of one Thomas Barlow Walker and are shareholders in the Red River Lumber Company (hereinafter referred to as "Red River"), a corporation founded by him. The defendant Blair H. Walker is Kenneth R. Walker's wife and the La Tour Peak Timber Company (hereinafter referred to as "La Tour") is a California corporation wholly owned by Kenneth R. Walker and his wife who are also its sole officers and directors.

For some thirty years prior to this litigation, Kenneth R. Walker was employed by Red River and the plaintiffs in various managerial capacities and resided in Westwood, California, close to the timber which is the subject of this controversy. During the last twenty years of this period he was employed on substantially a full time basis and, together with his uncle, Willis J. Walker, was a controlling executive of Red River's Land Department. This department handled all offers and sales of timber and land and all cutting contracts and leases. After his uncle's death in 1943, Kenneth R. Walker was in sole charge of the Land Department and as such executive, exercised his own judgment in all such timber matters.

At the time of the events set forth herein, Red River was in process of liquidation with Kenneth R. Walker and his cousin Walker Smith as liquidating trustees. Prior to May 1946, the corporation, which owned large tracts of timber land in northern California, had made five distributions of dividends and property in the form of timber lands, the distributees thereby becoming co-owners of the tracts so distributed. After each such distribution the tract was set up in the form of an Agency, the co-owners making formal appointment of agents to handle the tract for them. By reason of his superior knowledge of timber matters, Kenneth R. Walker was one of the agents appointed in each instance. This litigation involves the distribution made on May 31, 1946, which was thereafter designated as Agency Six.

Agency Six covered 150,000 acres of valuable timber lands known as the Shasta or West Slope timber. By its distribution the co-owners acquired undivided interests in varying percentages, depending upon the amount of stock owned by them. These percentages are unimportant for this discussion with the exception that it should be noted that Kenneth R. Walker held only 3 per cent. It should also be noted that while each liquidating trustee received an annual salary of $10,000, Kenneth R. Walker was the only agent to be compensated. He was paid $5,000 a year in such capacity, the sum being allocated to the various agencies, including Agency Six.

The formal documents setting up the Shasta timber as Agency Six were not sent out to the co-owners until August 13, 1946, a month after a meeting of Kenneth R. Walker and his co-trustee with some of the other Red River shareholders to discuss the disposition of this tract. The co-owners had divergent views, some wishing to sell their interests outright, some to place them under cutting contracts, and some being undecided. At this meeting Kenneth R. Walker failed to disclose the fact that he had already received an inquiry about the Shasta timber from one Harry Utley, a timber broker, who had informed him that the Harbor Plywood Corporation (hereinafter referred to as "Harbor") was interested in acquiring timber rights in that area. The meeting resulted in the decision, pertinent to our problem, that the operation of the Agency Six tract would be handled by Red River personnel. To quote from the minutes, approved by Kenneth R. Walker: "As a result of the transfer of the Westslope timber to the Red River stockholders some sort of a management organization will have to be set up. The timber owners discussed this problem and decided to appoint agents to handle this timber for them and *requested the trustees to continue to use Red River facilities to take care of the operation of the tract* and look to the agents of the new owners for reimbursement." (Emphasis the Court's.) Such operation by Red River included,

among other things, timber sales, the receiving of timber inquiries, the administration of timber contracts, cruising, fire fighting, the maintenance of trespass patrols and all of the intricate ownership accounting. Plaintiffs contend that in view of these activities and Kenneth R. Walker's position with Red River, the fact that none of the plaintiffs appointed him their formal agent under the Agency Six agreements is immaterial. Kenneth R. Walker had declined such appointment, stating that there was a possibility that he might wish to negotiate for a sawmill operation utilizing part of the Shasta timber.

Harbor next enters the picture on September 6, 1946, when E. W. Daniels, Harbor's president, telephoned long distance to Red River's office, seeking information about the Shasta timber. Since Kenneth R. Walker was in charge of the office, he took the call, but the evidence shows that he had had no prior contact with Daniels and that Daniels was not calling him personally. Indeed Daniels testified that he wanted to talk to "any Walker" who could give him information about the timber. Kenneth R. Walker told him that the timber belonged to a number of owners; that at that time it was not on the market and he didn't know what its future disposition would be; that, however, he was going back to Minneapolis and would talk to him when he returned; and he asked Daniels to write him a letter outlining his interest. On the trial Kenneth R. Walker testified that he was aware that his own 3 per cent undivided interest would not be sufficient to meet Harbor's requirements and, further, that no one had authorized him to state on behalf of the other co-owners that the timber was not for sale.

On September 9, 1946, Daniels wrote the requested letter, which was removed, along with later correspondence with Harbor, by Kenneth R. Walker to his home at Atherton, California, and there retained, unknown to the other co-owners. This was the only inquiry so appropriated by Kenneth R. Walker. During this same period he received other inquiries for the sale of Agency Six timber and processed them through the regular channels of Red River.

When he was asked, at the trial, why he gave these to the co-owners and kept the Daniels correspondence secret in his personal files, he replied: "A matter of personal preference. * * * It had to do to the fact that I was an undivided owner in the Shasta timber and absolutely free to deal with it as I saw fit."

On October 15, 1946, Kenneth R. Walker met with other co-owners in Minneapolis to discuss the Shasta timber. At this meeting two of the co-owners, Walker Smith and Dana Smith, spoke of their negotiations for a cutting contract with an unnamed broker, the purchaser to pay them a 1 per cent commission. Kenneth R. Walker concealed his inquiries from Utley and Daniels and stated that he might possibly have a conflicting interest in the tract and therefore would not undertake the chief responsibilities in connection with its management. The record discloses, however, that following this meeting Kenneth R. Walker continued to perform duties for Agency Six, as he had before, and his salary for that period was pro-rated to Agency Six as well as to the other agencies.

Kenneth R. Walker's next discussion with Daniels was on December 11, 1946, when he met with him during the course of a business trip to Portland, Oregon, and began negotiations for a 20-year cutting contract on a basis of $12 per thousand feet for pine, $6 for Douglas fir and cedar, and $4 for white and red fir. On the 18th, Daniels wired Kenneth R. Walker that Harbor's board of directors had authorized him to proceed with negotiations on that basis. A week or so later Kenneth R. Walker received a letter from his uncle, Archie Walker, one of the co-owners, asking for specific details as to timber sales and prices that he had learned about on his Portland trip and pointing out that this information was of utmost importance to the rest of the family. Kenneth R. Walker answered this letter on January 2, 1947, carefully failing to tell him about those negotiations.

This was the situation on January 13, 1947, when Red River stockholders met at the Palace Hotel in San Francisco and began a series of meetings that continued for

a number of days. Kenneth R. Walker, of course, knew that his projected deal with Harbor depended upon his acquiring from his co-owners a volume of timber that, added to his own 3 per cent interest, would be sufficient to meet Harbor's requirements of approximately one billion feet under the proposed cutting contract. Accordingly, on January 14th, he offered to purchase from his co-owners the right to cut Agency Six timber for resale to a then undisclosed purchaser at the rate of $11 per thousand feet for pine, $5.50 for Douglas fir and cedar and $3.50 for white and red fir, all much higher prices than any plaintiff co-owners had heard of for comparable timber. When questioned about the identity of his purchaser and the amount of his prospective profit, Kenneth R. Walker promised that he would reveal both before plaintiffs were called upon to complete the transaction and that his profit would be reasonable and acceptable to them. That it would not be acceptable must have been apparent to Kenneth R. Walker in view of the rather grudging approval given to the receipt of a 1 per cent commission by Walker and Dana Smith in their contract negotiations with the Ralph L. Smith Company. In this connection his testimony is illuminating. At the trial the following occurred:

"Q. If you felt you had a right to take that Daniels correspondence and make it a personal prospect instead of a prospect of the agency or the co-owners, why did you promise the co-owners in Agency Six that you would disclose your profit to them before you closed the transaction? A. Because it was the necessary condition, something I offered, was willing to do.

"Q. What do you mean by it when you say 'it was the necessary condition' at that time? A. Well, it was part of the negotiations I was carrying on.

"Q. They wouldn't negotiate with you unless you promised to disclose, is that it? A. No, they wanted, that is a condition in there, and I offered it."

The co-owners, including plaintiffs, appointed two of their number, Theodore S. Walker and Brooks Walker, to negotiate with Kenneth R. Walker on his proposal. These negotiations became triangular short-ly thereafter when some of the undivided interests were sold to the Ralph L. Smith Company which wished to engage in extensive cutting operations. At this time Kenneth R. Walker repeated his promises to disclose and later he did reveal that Harbor was his purchaser. At no time, however, did he reveal the amount of his profit nor is the evidence convincing that any of the co-owners knew, prior to October 1947, that he did not intend to make such disclosure.

During the negotiations Kenneth R. Walker told the other co-owners that any negotiations with third parties might delay the transaction and at his request they refrained from seeking other purchasers. It is quite evident from the record that they relied upon his experience in timber matters and knowledge of the market, even though they were dealing with him through negotiators and had legal counsel.

In March of 1947 Kenneth R. Walker and his wife formed the defendant La Tour Peak Timber Company, its one thousand shares of capital stock, valued at one dollar a share, being divided equally between them. La Tour appears to have been formed primarily for the purpose of receiving the cutting contract then in process of negotiation and assigning it to Harbor. Shortly thereafter the co-owners of the Agency Six tract entered into a partition agreement covering the timbered area, some 120,000 acres, by which the area was divided among four groups of owners called First Parties (including the defendant Kenneth R. Walker), Second Party (the defendant La Tour Peak Timber Company), Third Party (the Ralph L. Smith Company), and Fourth Parties (including the present plaintiffs). Because Kenneth R. Walker and the Ralph L. Smith Company desired cutting contracts on the same area, they divided the tract by an arbitrary line and agreed not to bid against each other for the timber north and south of such line for a period of one year without the other's written consent, thereby making it unnecessary for either Kenneth R. Walker or the Ralph L. Smith Company to offer any higher timber prices than those already proposed. This agreement elim-

5

inating competition was not disclosed to the Fourth Parties or to their negotiators.

In October of 1947 the terms of the option agreement and cutting contract and the division of the property between Harbor and the Ralph L. Smith Company were agreed upon. Plaintiffs then asked the defendant Kenneth R. Walker to reveal the amount of his profit on the sale to Harbor as he had promised to do before the closing. This re refused to do. After securing advice from legal counsel to the effect that the plaintiffs could close the transaction and proceed at law against Kenneth R. Walker, they suffered the transaction to be closed in order that the months of tedious and expensive negotiation would not be rendered useless.

Their first knowledge of the secret override which Harbor had agreed to pay Kenneth R. Walker on the timber purchased from them came in November of 1947 when the purchase price appeared in a stock prospectus issued by Harbor. In due course they demanded that Kenneth R. Walker return the amount of his secret profit and upon his failure to do so, plaintiffs instituted this action.

■ It appears to the Court clear from the foregoing recital that Kenneth R. Walker did sustain a fiduciary relationship to plaintiffs which required him to make full disclosure of all inquiries about the Shasta timber and which forbade him making any profit on it unless such profit was known and consented to by the other co-owners. He is not relieved from his fiduciary duty by the fact that none of the plaintiffs appointed him their formal agent for Agency Six. Kenneth R. Walker had received his first inquiry from Harbor, through Utley, more than a month before Agency Six was even set up and yet he concealed it at the July, 1946, meeting when the timber disposition was discussed. Furthermore, at the time of its distribution the Shasta tract was income producing property, much of which was under lease. It was, so to speak, a "going concern" which required experienced supervision and management. It seems obvious, from the evidence, that the formal agents were not equipped to provide either and, indeed,

this was recognized by the co-owners when they requested the liquidating trustees to continue to use Red River's facilities to take care of the tract's operation. As one of the two trustees and as head of Red River's Land Department, which among its other activities, received timber inquiries, Kenneth R. Walker was the actual agent of plaintiffs in the operation of Agency Six.

This, however, is not the sole basis for finding a fiduciary relationship. Plaintiffs and Kenneth R. Walker were not only co-owners, they were closely related by blood and it would have been strange indeed if these Minnesota plaintiffs, far removed from timber activities, had not looked for advice to the family member who was an acknowledged timber expert, or had failed to rely on the information furnished by him.

A similar situation was considered by the California District Court of Appeal in the case of Wehner v. Wehner, 68 Cal.App. 789, 230 P. 458. There the plaintiff and defendant were brothers and co-owners and copartners in a vineyard. The plaintiff was inexperienced and relied upon and trusted the defendant in all matters pertaining to this venture. The defendant purchased plaintiff's interest for $180,000, pursuant to a written agreement, when he knew its true value was at least $260,000 and he had been in consultation with parties interested in buying. The defendant not only misrepresented the vineyard's value to the plaintiff but also concealed the fact that he had prospective purchasers at a much higher price. When the plaintiff later discovered, through a notice of transfer in a newspaper, the actual sale price, he sued the defendant for damages for fraud. The appellate court affirmed a judgment for the plaintiff, holding that there was a fiduciary relationship based on the brothers' relations as partners and on the existence of an actual relationship of trust and confidence between the parties and that the defendant thus had the burden of showing the utmost good faith in his transaction with the plaintiff. The court pointed out that there is a presumption of undue advantage unless it appears the trusting friend had independent advice

and acted not only of his own volition but with full comprehension of the results of his action. See, also, Shaw v. Shaw, 160 Cal. 733, 117 P. 1048.

In the instant case the plaintiffs had independent legal advice but nowhere does the record disclose that they had independent advice on timber values. On the contrary, Kenneth R. Walker made quite certain that they would not have by his urging them not to investigate the market or seek other purchasers.

In denying liability the defendants assert that Kenneth R. Walker was plaintiffs' agent in only two matters, one, the salvaging of some fire-damaged timber and two, the establishing of the true market value of the Agency Six timber for tax purposes. Even if the Court should so find, defendants would not be materially assisted. The prospective sale of a billion feet of timber at the prices then being negotiated by Kenneth R. Walker and Harbor would have substantially affected the market value of the tract, yet Kenneth R. Walker concealed this information from the family accountants.

■ Defendants further assert that by going ahead and closing the transaction after Kenneth R. Walker's refusal to keep his promise to reveal his profit, the plaintiffs waived any fraud. This position is untenable, however, for two reasons. First, the plaintiffs have not sought rescission; they have affirmed the contract and sued for damages for the fraud. See Wehner v. Wehner, discussed above. Second, plaintiffs did not close the transaction *with full knowledge of the fraud*. Kenneth R. Walker's refusal to reveal his profit was only one part of his fraudulent conduct which began in July of 1946 with his concealment of Utley's inquiry, on behalf of Harbor, about the Shasta timber, and continued throughout his negotiations with Harbor. At no time did the plaintiffs know that Harbor was not a prospect secured by Kenneth R. Walker through his own initiative. They did not know that Utley, the timber broker, had approached Kenneth R. Walker about possible Shasta timber sales. They did not know that Kenneth R. Walker's direct contact with Daniels, Harbor's president, who wanted to talk to "any Walker" who could tell him about available timber, resulted solely from his position with Red River and the fact that he was physically present to take the telephone call. They knew that Kenneth R. Walker was the logical person to receive timber inquiries, because of his position with Red River. They knew that trade magazine advertisements for the Shasta timber directed interested parties to address their inquiries to him. They were dependent upon Kenneth R. Walker to advise them of such inquiries. They did not know that he would use his strategic position to their disadvantage by appropriating an inquiry that belonged to them all.

This appropriation, in the Court's opinion, is the basic fraud. Since the plaintiffs were ignorant of it in October, 1947, when they closed the transaction, they cannot be held to have waived this fraud.

■ This holding is not at variance with the authorities cited by defendants. Waiver is defined as the "intentional relinquishment of a known right." Such intentional relinquishment is shown when a party completes a fraudulently induced transaction after acquiring full knowledge of the fraud. A finding of waiver or nonwaiver thus depends upon the facts of each case. Since this is true, it is unnecessary to review the authorities extensively. A California case, Thomas v. Birch, 178 Cal. 483, 173 P. 1102, on which defendants particularly rely, will serve as an example. There the defendant made misrepresentations to the plaintiff stockholder concerning a certain oil well, for the purpose of securing plaintiff's stock at less than its true value. Before completing the sale of his stock the plaintiff learned the true facts but he went ahead and completed the sale and then, some three years later, sued the defendant for fraud. The court there held that by completing the transaction *with full knowledge of the fraud,* the plaintiff had waived it and could not thereafter be heard to complain. The difference between that factual situation and that the one before this Court is too clear to require comment.

In view of the foregoing, therefore, judgment will be given for the plaintiffs and against the defendants, upon findings of fact and conclusions of law in accordance with the detailed order for entry of judgment to be filed.